UNITED STATES of America, Plaintiff,

v.

John Joseph RINGIS, Defendant.

United States of America, Plaintiff,

v.

Juan Carlos Valdivia–Cardona, Defendant.

United States of America, Plaintiff,

v.

John Herman Buckendahl, Defendant.

United States of America, Plaintiff,

v.

Joseph John Johnson, Defendant.

Nos. CR 98–3016–MWB, CR 99–4001–MWB, CR 99–4005–MWB, CR 99–4007–MWB.

United States District Court, N.D. Iowa, Central Division.

Dec. 16, 1999.

Richard Murphy, Peter Deegan, Kevin Fletcher, Assistant United States Atty's, for U.S.

Jana Miner, Assistant Federal Defender, Sioux City, IA, for Ringis, Buckendahl, and Valdivia–Cardona, defendants.

R. Scott Rhinehart, Curtis Wiberg, Richard Rhinehart & Associates, Sioux City, IA, for Johnson, defendant.

MEMORANDUM OPINION AND OR-
 DER REGARDING DEFENDANT'S
 MOTION FOR DOWNWARD DE-
 PARTURE

BENNETT, District Judge.

TABLE OF CONTENTS

I. INTRODUCTION .................................................908
 A. Procedural Background .....................................908
 B. Factual Background ........................................910
 1. U.S.S.G. § 1B1.8 and its application in the federal districts ..............910
 2. Situation of the individual defendants.................................911
 a. Joseph John Johnson .........................................912
 b. John Joseph Ringis..........................................913
 c. Juan Carlos Valdivia–Cardona ..................................914
 d. John Herman Buckendahl......................................915

II. LEGAL ANALYSIS ..............................................917
 A. Departure From The Sentencing Guidelines .............................917
 1. Discretion ...............................................917
 2. Authority v. discretion.......................................918
 3. Analytical process .........................................920
 B. Authority To Depart.........................................921
 1. A feature that potentially takes the case "outside the 'heartland'" .........921
 2. Treatment of the feature under the Guidelines..........................923
 a. Does U.S.S.G. § 1B1.8 consider the feature? .......................923

 b. Is the feature considered or unmentioned?...........................926
 3. Sufficiency of the feature to take the case out of the heartland ............926
 a. Disparities arising from prosecutorial discretion ......................926
 b. The panel decision in Banuelos-Rodriguez ........................928
 c. The Jones decision ..............................................929
 d. Conflict with the structure and theory of the guidelines ..............931
 i. Conflict with the "substantial assistance" guideline ..............931
 ii. Conflict with the "safety valve" guideline ......................933
 iii. Conflict with the guidelines as a whole ........................934
 4. Prejudice to the defendants .......................................935
 a. The conundrums when § 1B1.8 protection is denied..................936
 b. Non–cooperators .............................................936
 i. Johnson's prejudice .........................................936
 ii. Ringis's prejudice ..........................................939
 iii. Valdivia–Cardona's prejudice ................................940
 c. The cooperating defendant .....................................941

III. CONCLUSION ...............................................................943

This decision addresses what the Court of Appeals for this Circuit has described as an "anomalous byproduct of the Sentencing Guidelines," the transfer of "discretion once held by judges to the government." *See United States v. Jones*, 160 F.3d 473, 483 (8th Cir.1998). The specific question before the court is the following: Can disparities between this federal district and the vast majority of other districts in the availability of use immunity within the scope of United States Sentencing Guideline § 1B1.8 protection, as a result of the policy or practice of the respective United States Attorney's Offices, provide a basis for downward departure in sentencing of defendants pleading guilty in the district in which denial of use immunity is the policy or practice?

The question is presented by four defendants in separate cases, each involving slightly different situations: one of the defendants pleaded guilty without a plea agreement upon denial of his request for a plea agreement affording him some § 1B1.8 protection; two of the defendants pleaded guilty pursuant to plea agreements that provided them with no § 1B1.8 protection, but did not require their cooperation; and one defendant provided detailed disclosures pursuant to a plea agreement that provided him with no § 1B1.8 protection. The first three defendants assert that the lack of § 1B1.8 protection

deprived them of the opportunity to make disclosures or provide cooperation that would have reduced their sentences, while the fourth asserts that his disclosures actually increased his sentence. All four assert that these consequences would not have been imposed upon them had they sought plea agreements in the Southern District of Iowa, or almost any other federal district, rather than the Northern District of Iowa, because the United States Attorney's Offices in the overwhelming majority of federal districts routinely grant cooperating defendants use immunity within the scope of § 1B1.8 protection, while the United States Attorney's Office for this District does not. The disparity between this and other districts in the availability of § 1B1.8 protection, they contend, takes their cases out of the "heartland" of the Guidelines, warranting a downward departure in each of their sentences.

## I. INTRODUCTION

### A. Procedural Background

The rather complicated procedure these four separate cases have pursued to this point began on July 23, 1999, when the court *sua sponte* continued the sentencing of defendant Johnson in Case No. CR 99–4007–MWB to obtain further briefing from the parties on the question of the availability of a reduction or downward departure based on the government's application of U.S.S.G. § 1B1.8.[1] On July 30, 1999, John-

---

1. Johnson had in fact raised the issue of the application of U.S.S.G. § 1B1.8 by the United

son filed a brief on the availability of such a ground for downward departure pursuant to the court's oral order at the July 23, 1999, sentencing hearing. By written order dated August 2, 1999, the court set a deadline of September 7, 1999, for further briefing on the availability of a downward departure and scheduled a hearing on October 7, 1999, for the completion of Johnson's sentencing. The court also invited the Federal Defender to submit a brief as *amicus curiae*. The government filed a resistance to downward departure in Johnson's case on August 6, 1999, and a more fully developed brief on September 7, 1999. The October 7, 1999, hearing was continued, and on October 21, 1999, the Federal Defender belatedly filed an *amicus curiae* brief in Johnson's case. The government filed a supplemental memorandum regarding Johnson's motion for downward departure on October 26, 1999.

Defendants Ringis, Valdivia–Cardona, and Buckendahl, all of whom are represented by the Federal Defender's Office, notified the court in late October that they would also be seeking downward departures in their sentences on grounds similar to those asserted by Johnson.[2] On Octo-

ber 27 and 28, the defendants in all four cases moved for a consolidated hearing on their motions for downward departure. Over the government's objections, the court agreed that a consolidated hearing would be appropriate and therefore held such a hearing on November 12, 1999.[3] At the consolidated hearing, the court heard evidence and arguments on the court's authority to make a downward departure on the ground asserted.

Following the consolidated hearing, the court came to the conclusion that it would be necessary to take all evidence pertaining to the sentence for each individual defendant before the court could determine whether it has the authority to make the requested downward departure, as well as whether such a downward departure is appropriate, in each individual's case. However, the court also concluded that such evidentiary hearings should be set in close proximity to each other, in part to facilitate a consolidated appeal, if any, of the sentences by either the defendants or the government. Therefore, the court conducted individual sentencing hearings for defendants Johnson, Ringis, and Buckendahl on November 22, 1999.[4] The sentenc-

States Attorney's Office for the Northern District of Iowa, and the effect of the government's denial of use immunity for information provided in debriefing, a number of times in the course of sentencing. Thus, while further consideration of the issue may have been instigated by the court, Johnson had already placed the matter at issue. Furthermore, to the extent the government suggests that the court *sua sponte* raised the issue as a ground for downward departure, the court notes that on various occasions, this court has pursued grounds for *upward* departures *sua sponte*, with no complaint from the government.

**2.** Two of these three defendants, Ringis and Buckendahl, eventually incorporated written requests for downward departure into their sentencing memoranda filed on November 19, 1999. Defendant Valdivia–Cardona did not file a written motion; instead, at his individual sentencing hearing on December 8, 1999, defendant Valdivia–Cardona made an oral motion for such a downward departure.

**3.** At the consolidated hearing, the government was represented by Richard Murphy, Assistant United States Attorney, of Cedar Rapids,

Iowa, and Peter Deegan, Assistant United States Attorney, of Sioux City, Iowa. Defendant Johnson, who was personally present, was represented by R. Scott Rhinehart and Curtis Wiberg of Richard Rhinehart & Associates in Sioux City, Iowa. Defendants Ringis, Buckendahl, and Valdivia–Cardona, who all waived personal appearance at the hearing, were represented by Jana Miner, Assistant Federal Defender, of Sioux City, Iowa.

**4.** At the hearings on November 22, 1999, the government was represented by Peter Deegan, Assistant United States Attorney, and in Buckendahl's case, by Kevin Fletcher, Assistant United States Attorney, of Sioux City, Iowa, as well as by Mr. Deegan. At his November 22, 1999, hearing, defendant Johnson was represented by R. Scott Rhinehart and Curt Wiberg of Richard Rhinehart & Associates in Sioux City, Iowa. At their hearings, defendants Ringis and Buckendahl were represented by Jana Miner, Assistant Federal Defender, of Sioux City Iowa.

ing hearing for defendant Valdivia–Cardona, also originally scheduled for November 22, 1999, was continued, because the presentence investigation report in his case had not yet been completed. Defendant Valdivia–Cardona's individual sentencing hearing was eventually held on December 8, 1999.[5]

In the same order setting separate sentencing hearings, the court also scheduled the completion of the individual sentencing hearings and imposition of sentence in each individual's case for December 20, 1999. The present opinion memorializes the court's disposition of each defendant's motion for downward departure.

### B. Factual Background

The court will begin its discussion of the factual background to the present motions for downward departure with a reprise of some of the evidence presented at the consolidated hearing. That evidence was proffered on the question of the court's authority, as a general matter, to make a downward departure in sentencing on the basis of a disparity in policy or practice between the United States Attorney's Offices for the federal districts regarding availability of "use immunity" within the scope of U.S.S.G. § 1B1.8 protection, and the existence of such a disparity. The court will then turn to a discussion of the factual background in each defendant's case, as developed during the individual sentencing hearings. That evidence goes to the question of whether the court has the authority to grant an individual defendant a downward departure on the ground asserted, as well as to the question of whether a downward departure is warranted as a matter of fact in each defendant's case.

### 1. U.S.S.G. § 1B1.8 and its application in the federal districts

At the consolidated hearing on November 12, 1999, the defendants presented the testimony of Peter Hoffman, the former principal technical advisor to the United States Sentencing Commission, and Nicholas Drees, the Federal Defender for the Northern and Southern Districts of Iowa. The government objected to the testimony of Mr. Hoffman, at least in so far as that testimony was intended to explicate the purpose and effect of U.S.S.G. § 1B1.8, on the ground that it was inappropriate to consider on those issues anything other than the language of § 1B1.8 itself, other pertinent guidelines, and the official commentary to the guidelines. However, the court believes that the facts specifically presented here, to the extent they can be drawn from Mr. Hoffman's testimony, can also be gleaned, for the most part, from the Sentencing Guidelines themselves, or the commentaries, historical notes, and appendices thereto.

The court therefore finds as follows:

U.S.S.G. § 1B1.8 was not in the first draft of the Sentencing Guidelines. Instead, it was added by emergency amendment on June 15, 1988. See U.S.S.G. § 1B1.8, Historical Note; U.S.S.G. Appendix C, amendment 5. The stated purpose of the amendment was "to facilitate cooperation agreements by ensuring that certain information revealed by a defendant, as part of an agreement to cooperate with the government by providing information concerning unlawful activities of others, will not be used to increase the guideline sentence." U.S.S.G. Appendix C, amend. 5. Mr. Hoffman testified, the government did not dispute, and the court therefore finds, that the amendment was requested in the first instance by the Department of Justice, with the later concurrence of the advisory committee of practitioners, which included members from the defense bar. The government does, however, dispute the relevance of this evidence concerning the genesis of the amendment.

Mr. Drees testified, based on his own experience and the reports of his assis-

---

**5.** The government was represented at defendant Valdivia–Cardona's individual hearing by Peter Deegan, Assistant United States At-
torney. Defendant Valdivia–Cardona was represented by Jana Miner, Assistant Federal Defender.

tants, that there is a clear disparity in the use of U.S.S.G. § 1B1.8 between the Northern and Southern Districts of Iowa. While "use immunity" within the scope of § 1B1.8 protection is routinely a part of plea agreements negotiated in the Southern District, Mr. Drees testified that it is very rare in the Northern District. The government presented evidence that plea agreements in the Northern District do, upon very rare occasions, include "use immunity" terms that would fall within § 1B1.8 protection. However, the government conceded, when pressed, that it is the general "practice"—though the government would not admit to an official "policy"—of the United States Attorney's Office for this district *not* to make available such "use immunity" within the scope of § 1B1.8 protection as part of plea agreements. Indeed, in response to the court's questions, Assistant United States Attorney Rich Murphy, the chief of the criminal division of the United States Attorney's Office for the Northern District of Iowa, acknowledged that the number of times he knew of that § 1B1.8 protection had been included in plea agreements in the Northern District of Iowa in the last five years could be counted on one hand. Mr. Drees's testimony and the concessions of the government concerning the relative availability or unavailability of use immunity in the two districts are in accord with the undersigned's own experience as a federal district judge in this district and a former magistrate judge in the Southern District; indeed, the undersigned cannot recall a single plea agreement in the Northern District coming to his notice that contained a use immunity provision within the scope of § 1B1.8 protection. The court therefore finds that there is a significant disparity between the two federal districts of Iowa in the availability of § 1B1.8 protection for defendants agreeing to plead guilty: Such protection is routinely available in the Southern District of Iowa and routinely—indeed, almost completely—unavailable in the Northern District, as a matter of a disparity in practice by the respective United States Attorney's Offices. However, the parties agree, and the court finds, that defendants do, with some frequency, enter into plea or cooperation agreements in the Northern District of Iowa without the benefit of some kind of § 1B1.8 protection. The court finds that, for the "privilege" of pleading guilty in the Northern District of Iowa, a defendant *must*—except in situations so rare that the undersigned has never seen one—also accept denial of § 1B1.8 protection.

The parties agree further that the "practice" concerning the availability of "use immunity" within the scope of U.S.S.G. § 1B1.8 protection in the Northern District of Iowa is clearly in the minority as a matter of nationwide practice, although no party was able to determine—despite efforts by both defendants and the prosecution—precisely how many of the ninety-four federal districts have such a "practice" or "policy." The consensus of the parties appears to be that no more than three or four other federal districts routinely *do not* provide in plea agreements some degree of "use immunity" that comes within the scope of § 1B1.8 protection. The court so finds.

With this general background, the court turns to the circumstances of the individual defendants.

**2. Situation of the individual defendants**

As mentioned at the outset of this opinion, the requests for downward departures at issue here are presented by four defendants in separate cases, each involving slightly different situations: one of the defendants pleaded guilty without a plea agreement upon denial of his request for a plea agreement affording him some § 1B1.8 protection; two of the defendants pleaded guilty pursuant to plea agreements that provided them with no § 1B1.8 protection, but did not require them to cooperate with the prosecution; and one defendant provided detailed disclosures pursuant to a plea agreement that provided him with no § 1B1.8 protection. Al-

though all defendants assert that the lack of § 1B1.8 protection in this district had a detrimental effect on their sentences, each defendant asserts that the appropriate downward departure premised on the lack of § 1B1.8 protection in his case should be measured by a slightly different yardstick. Since the issue presented here first arose in defendant Johnson's case, the court will began its review of the situation of the defendants with the facts in Johnson's case.

### a. Joseph John Johnson

The government filed a criminal complaint against Johnson on January 26, 1999, charging Johnson and another of possessing methamphetamine with intent to distribute it. Johnson had an initial appearance on the charge that day. Johnson, with another, was subsequently indicted on Count 1 of a two-count indictment on February 19, 1999. That count of the indictment charged Johnson with possessing methamphetamine with intent to distribute it, or aiding and abetting the possession of methamphetamine with intent to distribute it, in violation of 21 U.S.C. § 841(a)(1). Johnson was arraigned on the charge against him in the indictment on February 24, 1999, and trial was set at that time for April 5, 1999. Johnson, however, filed a motion to suppress evidence on March 24, 1999, which caused a continuance of his trial. The court denied Johnson's motion to suppress evidence on May 28, 1999, upon this court's acceptance of a report and recommendation of a magistrate judge.

On June 18, 1999, without the benefit of a plea agreement, defendant Johnson pleaded guilty to the charge against him in Count I of the indictment. Johnson's counsel had advised him not to enter into a plea agreement with the government that did not include "use immunity" protection within the scope of U.S.S.G. § 1B1.8. It

was counsel's view that Johnson's increased sentencing exposure from information he might divulge about his criminal activity in a debriefing with the government would exceed any benefits he might receive from a downward departure based on a "substantial assistance" motion from the government. The parties stipulated, and the court therefore finds, that Johnson's counsel sought a plea agreement with the government that contained some use immunity within the scope of U.S.S.G. § 1B1.8 protection, but counsel's request for such a plea agreement was denied. Johnson is the only defendant now before the court who decided to plead guilty with no plea agreement whatsoever when his request for a plea agreement including § 1B1.8 protection was denied.

At the initial sentencing hearing in Johnson's case, held on July 23, 1999, the court determined Johnson's base offense level to be 32, applied a two-level enhancement for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, based on Johnson's untruthful testimony at the suppression hearing, and declined to apply any reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1, or the "safety valve," U.S.S.G. § 5C1.2.[6] Thus, the court found Johnson's total offense level to be 34, with a criminal history category of 1. The resulting Sentencing Guideline range for Johnson's sentence is 151 to 188 months. After these determinations, the sentencing hearing was continued to explore the availability of a downward departure based on the disparity in application of U.S.S.G. § 1B1.8 between this and federal districts.

At Johnson's second individual sentencing hearing, on November 20, 1999, the government presented the testimony of a cooperating witness. That witness testified to his experience collecting drug debts for Johnson and another individual associated with Johnson, and to the pres-

---

6. The court found, *inter alia*, that the recent decision of the Eighth Circuit Court of Appeals in *United States v. Honken*, 184 F.3d 961, 968–69 (8th Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 602, —— L.Ed.2d ——

(1999), precluded a reduction for acceptance of responsibility when the defendant was found to have obstructed justice, as in the circumstances presented here.

ence in the living room of Johnson's residence of various weapons during drug transactions or while Johnson and others were conducting or preparing to conduct business related to drug trafficking. Although the cooperating witness testified that Johnson disliked violence, he also testified that Johnson was present as a participant while weapons were used by others to intimidate persons who owed money for drugs to the person from whom Johnson obtained his supply of methamphetamine. Johnson contends that the cooperating witness's testimony is not credible and should therefore be disregarded. However, the court finds that the cooperating witness's testimony *is* credible as to the presence of weapons in Johnson's residence during events pertinent to the charges against him and Johnson's participation in attempts to intimidate persons owing drug debts to his associate during which weapons were used or carried.

Johnson argues that denial of § 1B1.8 protection not only created a risk that his sentence would be increased on the basis of any disclosures he might make, but also deprived him of the benefits of other provisions of the Sentencing Guidelines, including the "substantial assistance" and "safety valve" provisions. Apart from the present motion for downward departure, there are no other outstanding sentencing issues in Johnson's case.

### b. *John Joseph Ringis*

Unlike defendant Johnson, who was arrested following an investigation of his drug-trafficking activities, defendant Ringis's arrest on drug charges was a collateral result of a murder investigation. A murder suspect had been seen in the vicinity of Ringis's residence, so police obtained a search warrant of Ringis's residence to determine whether the suspect had been, or was still, in the residence. In the course of the execution of that first search warrant, investigators apparently noticed possible evidence of drugs in the house. Investigators obtained a second search warrant, the execution of which led to the discovery and seizure of drugs and weap-

ons from Ringis's residence and Ringis's arrest on drug charges on July 27, 1998.

On September 22, 1998, Ringis was indicted as the sole defendant on a four-count indictment. Count 1 of the indictment charged him with possession of methamphetamine with intent to distribute it in violation of 21 U.S.C. § 841(a)(1). Count 2 charged him with being a felon in possession of nine firearms and a few hundred rounds of ammunition in violation of 18 U.S.C. § 922(g)(1). Count 3 charged him with being an unlawful user of controlled substances in possession of the same nine firearms and ammunition described in Count 2 in violation of 18 U.S.C. § 922(g)(3). Count 4 of the indictment charged Ringis with possession of an unregistered sawed-off shotgun in violation of 26 U.S.C. § 5841.

Ringis was arraigned on the charges against him on September 28, 1998, and his trial was initially set for December 7, 1998. Trial was continued several times, and Ringis eventually agreed to plead guilty. On September 16, 1999, Ringis pleaded guilty to Counts 1 and 3 of the indictment. Unlike defendant Johnson, who had no plea agreement whatsoever, defendant Ringis pleaded guilty to two of the four counts against him pursuant to a plea agreement with the United States Attorney's Office for the Northern District of Iowa, albeit one that does not include a use immunity provision within the scope of U.S.S.G. § 1B1.8 protection. Instead, the plea agreement, dated April 21, 1999, but signed by Ringis on September 16, 1999, does not require Ringis to cooperate with the government and expressly stipulates that Ringis understands that, because he has *not* provided substantial assistance to the government, he will not be entitled to any motion by the government for a reduction in sentence pursuant to U.S.S.G. § 5K1.1 or 18 U.S.C. § 3553(e).

Like defendant Johnson, Ringis was advised by counsel shortly after his arrest that, even if he decided to cooperate with the government, owing to counsel's experi-

ence with prosecutors in this district, any information he disclosed concerning drugs or weapons would likely be used to establish or increase his sentencing guideline range. Because of this concern, and the lack of certainty of a "substantial assistance" motion, Ringis chose not to cooperate with the government.

Ringis's sentencing guideline range, as calculated in his presentence investigation report (PSIR), is 121 to 151 months. Ringis seeks a downward departure on the ground in question here to the mandatory minimum for the offenses to which he is pleading guilty, that is, to 60 months, on the basis of his "lost chance" to obtain a "substantial assistance" reduction and to "penalize" the government for withholding, as a matter of district practice, the only means by which Ringis could have reduced his sentence. Ringis concedes that, apart from the present motion for downward departure, there are no other disputed sentencing issues.

### c. *Juan Carlos Valdivia–Cardona*

Defendant Valdivia–Cardona, like defendant Johnson, was arrested in the course of an investigation of his involvement in drug trafficking. The parties agree that defendant Valdivia–Cardona was arrested immediately after he received delivery through the mail of two packages containing controlled substances. One package contained cocaine and the other contained methamphetamine. Valdivia–Cardona maintains that, although he knew both packages would contain controlled substances, he did not know that the so-called "package # 2" contained methamphetamine.

The government filed a criminal complaint against defendant Valdivia–Cardona on January 12, 1999, charging him of possession of methamphetamine with intent to distribute it and possession of cocaine with intent to distribute it. Valdivia–Cardona had an initial appearance on that charge the following day. Subsequently, on January 22, 1999, the government filed an indictment against Valdivia–Cardona charging him with five offenses. Count 1 of the indictment charged him with possession of methamphetamine with intent to distribute it in violation of 21 U.S.C. § 841(a)(1). Count 2 charged him with possession of cocaine with intent to distribute it in violation of 21 U.S.C. § 841(a)(1). Count 3 charged Valdivia–Cardona with use of a communication facility (the mail) to commit, cause to be committed, or to facilitate the offense set forth in Count 1 in violation of 21 U.S.C. § 843(b). Count 4 of the indictment charged Valdivia–Cardona with use of a communication facility (the mail) to commit, cause to be committed, or to facilitate the offense set forth in Count 2 in violation of 21 U.S.C. § 843(b). Finally, Count 5 of the indictment charged that Valdivia–Cardona was an alien previously excluded and removed from the United States who was thereafter found unlawfully in the United States in violation of 8 U.S.C. § 1326(a). At his arraignment on January 25, 1999, Valdivia–Cardona pleaded not guilty to all counts of the indictment. Trial was originally set for March 29, 1999.

The trial date was continued several times. Eventually, Valdivia–Cardona entered a plea of guilty, without § 1B1.8 protection, to Counts 2 and 5 of the indictment, the charge of possession of cocaine with intent to distribute it and the illegal reentry charge, respectively, pursuant to a plea agreement entered into on October 20, 1999. The undersigned accepted Valdivia–Cardona's plea on November 16, 1999, upon the report and recommendation of a magistrate judge.

As with defendant Johnson, the parties stipulated, and the court therefore finds, that Valdivia–Cardona's counsel sought a plea agreement with the government that contained some use immunity within the scope of U.S.S.G. § 1B1.8 protection, but counsel's request for such a plea agreement was denied. Like defendant Ringis, and unlike Johnson, defendant Valdivia–Cardona entered into a plea agreement notwithstanding the lack of § 1B1.8 protection. However, like the plea agreement

accepted by defendant Ringis, defendant Valdivia–Cardona's plea agreement does not require Valdivia–Cardona to cooperate with the government and expressly stipulates that Valdivia–Cardona understands that, because he has *not* provided substantial assistance to the government, he will not be entitled to any motion by the government for a reduction in sentence pursuant to U.S.S.G. § 5K1.1 or 18 U.S.C. § 3553(e).

Valdivia–Cardona's base offense level pursuant to the PSIR is 26, based on his possession of the cocaine and methamphetamine in the two packages delivered to him just before his arrest and some additional quantities of cocaine and methamphetamine found in his coat pocket. At his individual sentencing hearing on December 8, 1999, neither Valdivia–Cardona nor the government contested this base offense level, although Valdivia–Cardona registered his disagreement with the guidelines that result in this level, in view of his assertion that he lacked any knowledge that package # 2 contained methamphetamine rather than cocaine. The government conceded that this legal disagreement did not detract from Valdivia–Cardona's acceptance of responsibility, in light of his admission that he had received packages he knew contained controlled substances. Therefore, the government stated that it would not contest a reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. The PSIR recommends a two-level reduction pursuant to U.S.S.G. § 3E1.1(a) and an additional one-level reduction pursuant to U.S.S.G. § 3E1.1(b) for acceptance of responsibility, which results in an adjusted offense level of 23. Valdivia–Cardona conceded that he is not entitled to a "safety valve" reduction pursuant to U.S.S.G. § 5C1.2. Therefore, the court finds that the total offense level for Valdivia–Cardona is 23, with a criminal history category of 1, resulting in a sentencing guideline range of 46 to 57 months, with

sentences on the two offenses to run concurrently pursuant to U.S.S.G. § 5G1.2(c).[7]

At his individual sentencing hearing, Valdivia–Cardona contended that his inability to obtain a plea agreement including "use immunity" within the scope of U.S.S.G. § 1B1.8 protection deprived him of the opportunity to obtain a "role" reduction pursuant to U.S.S.G. § 3B1.2 or a "substantial assistance" reduction pursuant to U.S.S.G. § 5K1.1. Valdivia–Cardona's counsel expressed her "confidence" that, had Valdivia–Cardona debriefed without § 1B1.8 protection, his base offense level would have risen, based on quantity of drugs, even had he disclosed sufficient information to obtain a role reduction. His counsel asserted further that the lack of § 1B1.8 protection prevented counsel from making a proffer to establish these contentions, as such a proffer in these circumstances would violate attorney-client confidences. Valdivia–Cardona seeks a downward departure for disparate denial of § 1B1.8 protection to reduce him to the offense level that would have resulted had the methamphetamine in package # 2 not been calculated against him, that is, to level 24, and possibly as low as level 22. The government contends that there is no sufficient basis in the record for the court to find that Valdivia–Cardona would have received a "role" or "substantial assistance" reduction had he cooperated with the government.

### d. *John Herman Buckendahl*

Defendant Buckendahl's situation is considerably different from that of the other defendants under discussion here. The Federal Defender's Office was appointed to represent Buckendahl in a miscellaneous case on September 17, 1998. Subsequently, the government filed a two-count criminal information against Buckendahl on February 12, 1999. Count 1 of the

---

**7.** Without the acceptance of responsibility reduction, the total offense level for Valdivia–Cardona would be 26, with a criminal history category of 1, resulting in a sentencing guideline range of 63 to 78 months.

information charged Buckendahl with conspiracy to distribute methamphetamine, to distribute methamphetamine within one thousand feet of a public school, and to distribute cocaine in violation of 21 U.S.C. § 846. Count 2 of the information charged Buckendahl with conspiracy to conduct money-laundering transactions in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i). Buckendahl filed a waiver of indictment on February 12, 1999. He was arraigned on February 19, 1999, at which time he entered a plea of guilty to both counts of the information pursuant to a plea agreement with the government.

The plea agreement, dated February 5, 1999, and accepted by Buckendahl on February 10, 1999, includes a cooperation agreement and a "limited use immunity" provision. That provision prohibits the government from using information disclosed pursuant to the agreement for the purpose of bringing further drug-related charges under Title 21 or firearms-related charges under Title 18 of the United States Code. However, the "limited use immunity" provision expressly allows the use of the information disclosed, *inter alia,* by the court or probation office at any time, including use at the time of Buckendahl's guilty plea and sentencing and to determine the length of his sentence. The provision also states that information provided by the defendant in the course of any "proffer" may be relied upon and considered under the terms and conditions of the agreement. Thus, the "use immunity" provision of Buckendahl's plea agreement provides none of the protection that U.S.S.G. § 1B1.8 might provide from use of information obtained from Buckendahl's cooperation against him at sentencing.

Considerably before Buckendahl entered into the federal plea agreement on February 10, 1999, he signed a "COOPERATION STATEMENT" on January 14, 1998, with investigating officers of a joint local, state, and federal drug enforcement task force. In that Cooperation Statement, Buckendahl acknowledged, *inter alia,* that the investigating officers had no authority to negotiate a plea agreement or other arrangement concerning charges against him; that information concerning the extent of his cooperation would be made available to prosecuting attorneys, who would make the decisions concerning the impact of his cooperation on any charges against him; and that any information he disclosed to the investigating officers could be "fully considered" in any future judicial proceeding. On October 15, 1998, Buckendahl also signed a proffer letter, dated September 15, 1998, pursuant to which he agreed that information pursuant to the "informal proffer" would not be used in trial, except "in the event your client is ever convicted of a criminal charge, by a court for use at the time of sentencing," and other circumstances not relevant here. *See* Defense Exhibit 1 (Proffer Letter), p.2, ¶ b.

Prior to the hearing for acceptance of Buckendahl's plea, Buckendahl and the government stipulated that his base offense level is 40, that he would be subjected to a two-level enhancement for possession of a dangerous weapon under U.S.S.G. § 2D1.1(b)(1), and that he would be subjected to a four-level upward adjustment for his role in the offense under U.S.S.G. § 3B1.1(a). The proposed PSIR also includes a three-level reduction for acceptance of responsibility, resulting in a guideline level of 43, and criminal history of 1, for a guideline range of life imprisonment.

The critical issue at Buckendahl's individual sentencing hearing on November 22, 1999, was whether Buckendahl's debriefing pursuant to his federal plea agreement had increased his sentencing level by one level for role in the offense (from three to four levels) and by two levels for dealing drugs within a school zone. Buckendahl contended that his own debriefing confirmed what the government had only suspected regarding his leadership role in the drug-trafficking conspiracy and his dealing of drugs within a school zone. The government contended, on the basis of statements of Buckendahl and others obtained

during the joint task force investigation, that it knew everything necessary to establish Buckendahl's offense level as a 46 (without an adjustment for acceptance of responsibility) before Buckendahl debriefed pursuant to the February 10, 1999, federal plea agreement.

More specifically, the government asserts that eight statements of cooperators, including Buckendahl, that were admitted into evidence at the sentencing hearing demonstrate an independent basis for the government's knowledge of the full extent of Buckendahl's criminal activities upon which his sentencing level is based prior to his debriefing pursuant to his federal plea agreement. The government argues further that it already had in its possession organizational charts obtained in 1997 that demonstrate Buckendahl's leadership role in the conspiracy for which he was charged.

Buckendahl counters that the identity of the person the government asserts is Buckendahl in the organizational charts from 1997 is, at best, uncertain. Furthermore, Buckendahl argues that interviews on which the government relies were obtained after Buckendahl agreed to cooperate with task force investigators; thus, Buckendahl attempts to invoke protection like that afforded under U.S.S.G. § 1B1.8 from the time he signed the cooperation statement with investigators on January 14, 1998. Furthermore, he argues that the statements of cooperators, like those entered into evidence here, are inevitably self-serving, and in certain respects, the statements entered into evidence here are so ludicrous as not to be credible. For example, Buckendahl points out that one cooperator's statement that he helped Buckendahl package 120 pounds of methamphetamine on a single occasion is wildly out of proportion to the total amount of methamphetamine used to calculate his total offense level in the PSIR. This disparity between statements and "reality," Buckendahl suggests, demonstrates that the government, at best, only suspected the extent of his criminal activities until he confirmed them with his own statements

pursuant to the February 10, 1999, federal plea agreement.

The court will reserve for discussion in its legal analysis the question of whether Buckendahl has met his burden of establishing that his sentence was increased by cooperation statements that otherwise would have received " § 1B1.8 protection," as well as the related question of whether the government had an independent basis for determining Buckendahl's present offense level prior to Buckendahl's entry into his federal plea agreement on February 10, 1999, or prior to some other critical date from which § 1B1.8 protection should apply.

## II. LEGAL ANALYSIS

Because the matter before the court in each of these cases is a motion for downward departure in sentencing, the court will begin its legal analysis with a discussion of the general requirements for departures from the Sentencing Guidelines. Next, the court will consider whether it has the authority to depart from the Sentencing Guidelines on the basis of a disparity in practice between districts on the availability of "use immunity" within the scope of U.S.S.G. § 1B1.8 protection. Finally, if the court finds that it has the authority to make such a departure in any defendant's case, the court will consider whether to exercise its discretion to grant such a downward departure in that defendant's case.

### A. Departure From The Sentencing Guidelines

#### 1. Discretion

The Eighth Circuit Court of Appeals recently explained that "the sentencing guidelines are designed to achieve uniformity in federal sentencing." *United States v. Decora,* 177 F.3d 676, 678 (8th Cir.1999) (citing *Mistretta v. United States,* 488 U.S. 361, 367, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989)). However, "they also preserve for the sentencing judge the discretion to depart." *Decora,* 177 F.3d at 678 (citing

*Mistretta*). Similarly, the Supreme Court has observed that "[a] district court's decision to depart from the Guidelines ... will in most cases be due substantial deference, for it embodies the traditional exercise of discretion by a sentencing court." *Koon v. United States,* 518 U.S. 81, 98, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); *Decora,* 177 F.3d at 678 (quoting *Koon*). Thus, "[t]he decision as to whether and to what extent departure is warranted rests with the sentencing court on a case-specific basis.'" *Decora,* 177 F.3d at 677 (quoting U.S.S.G. § 5K2.0).

Nonetheless, as most district judges at some time or another become painfully aware, the sentencing judge's discretion to depart from the Guidelines is closely circumscribed: "The Sentencing Commission 'forbids consideration of a few grounds for departure, discourages or encourages use of some specific grounds, and does not mention others.'" *United States v. Diaz–Diaz,* 135 F.3d 572, 580 (8th Cir.1998) (quoting *United States v. Kapitzke,* 130 F.3d 820, 822 (8th Cir.1997), which in turn cites *Koon,* 518 U.S. at 92–94, 116 S.Ct. 2035). Pursuant to 18 U.S.C. § 3553(b) and Guideline 5K2.0, "the sentencing court may [only] impose a sentence outside the range established by the applicable guidelines, if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" U.S.S.G. § 5K2.0 (quoting 18 U.S.C. § 3553(b)); *Decora,* 177 F.3d at 677 ("The sentencing court may depart downward if the court finds that there exists a mitigating circumstance of a kind or degree not adequately taken into consideration in formulating the guidelines.") (citing U.S.S.G. § 5K2.0); *United States v. Woods,* 159 F.3d 1132, 1134 (8th Cir.1998) ("Under *Koon v. United States,* 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), a district court may depart from the Sentencing Guidelines if 'the court finds that there exists an aggravating or mitigating circumstance of a kind,

or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.' *Id.* at 92, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (quoting § 18 U.S.C. 3553(b))."). In the words of the Supreme Court, the Sentencing Commission "did not adequately take into account cases that are, for one reason or another, 'unusual.'" *Koon,* 518 U.S. at 93, 116 S.Ct. 2035 (citing U.S.S.G. ch. 1, pt. A, intro. comment. 4(b)). Therefore, the Court concluded that, under the Guidelines, departures may be considered only in "atypical" cases. *Id.; accord* U.S.S.G. § 5K2.0 (policy statement) & commentary (observing that departures will be "extremely rare").

### 2. *Authority v. discretion*

■ Although the Sentencing Guidelines preserve the court's discretion to depart in cases that are sufficiently "atypical," there is a difference between the court's discretion to depart and its authority to do so. The question of the court's *authority* to grant a departure is reviewed as a question of law *de novo. United States v. Maxwell,* 25 F.3d 1389, 1400 (8th Cir.), *cert. denied,* 513 U.S. 1031, 115 S.Ct. 610, 130 L.Ed.2d 519 (1994); *accord United States v. Polanco,* 53 F.3d 893, 897 (8th Cir.1995), *cert. denied,* 518 U.S. 1021, 116 S.Ct. 2555, 135 L.Ed.2d 1073 (1996). In contrast, the Eighth Circuit Court of Appeals has made clear that where a court understands its authority to depart from the sentence indicated by the guidelines on the basis asserted, but exercises its discretion not to depart on the facts of the case, the denial of a departure is, in most circumstances, unreviewable. *See, e.g., United States v. Jones,* 145 F.3d 959, 965 (8th Cir.) (" 'Failure to depart downward is reviewable only if the district court did not realize that it had the discretion to consider a downward departure.' ") (quoting *United States v. Knight,* 58 F.3d 393, 398 (8th Cir.1995) (internal citation omitted), *cert. denied,* 516 U.S. 1099, 116 S.Ct. 827,

133 L.Ed.2d 770 (1996)), *cert. denied,* —— U.S. ——, 119 S.Ct. 457, 142 L.Ed.2d 410 (1998); *United States v. Saelee,* 123 F.3d 1024, 1026 (8th Cir.1997) (where the district court correctly understood its discretionary authority to depart rested upon a determination that circumstances of the case make it exceptional and atypical, such that it is outside the heartland of cases, its decision not to exercise such authority is unreviewable); *United States v. Hernandez–Reyes,* 114 F.3d 800, 802 (8th Cir.1997) (when the district court correctly understands its authority to depart on a particular basis from the applicable guideline range, but makes the discretionary decision not to do so, that decision is unreviewable on appeal absent an unconstitutional motive); *United States v. Knight,* 96 F.3d 307, 311 (8th Cir.1996) (same), *cert. denied,* 520 U.S. 1180, 117 S.Ct. 1458, 137 L.Ed.2d 562 (1997).

■ More specifically, the authority to depart depends upon whether the circumstances, as a general principle, make the case exceptional and atypical enough to take it outside the heartland, and that question is reviewed *de novo* as a question of law. *See Saelee,* 123 F.3d at 1026 ("[T]he district court correctly understood that its discretionary authority to depart rested upon a determination that the circumstances of this case make it exceptional and atypical, such that it is outside the heartland of cases. Because the district court understood its authority to depart downward, but declined to do so in the circumstances presented, its decision not to exercise that authority is unreviewable."); *Polanco,* 53 F.3d at 897 ("Whether the circumstances relied upon by the sentencing court to depart are sufficiently unusual to justify departure is a question of law which we review de novo."); *Maxwell,* 25 F.3d at 1400 ("[w]hether the circumstance upon which the district court relies to depart *is of a kind or degree* that may appropriately be relied upon to justify departure is a question of law [the appellate courts] review de novo.") (emphasis added).

■ Although authority to depart is reviewed as a question of law *de novo,* where authority exists, the court's discretionary determination of whether or not to depart, based on the facts of a particular defendant's case, is unreviewable. *See Decora,* 177 F.3d at 677 (" 'The decision as to whether and to what extent departure is warranted rests with the sentencing court on a case-specific basis.' ") (quoting U.S.S.G. § 5K2.0). The Eighth Circuit Court of Appeals distinguished between discretion and authority in *United States v. Nichols,* 151 F.3d 850 (8th Cir.1998). In *Nichols,* the appellate court rejected the defendant's argument that the sentencing court did not understand it had the authority to grant a downward departure on the basis of minimal or minor participation in the offense, observing as follows:

> There can be no doubt that the judge was fully aware of his authority to give Nichols an adjustment for minimal or minor participation *if he thought it was warranted. That he felt he had no basis, as he said, to depart (a term of art under the Guidelines) is distinct from a belief that he lacked authority to adjust the base offense level* for Nichols's role in the conspiracy under [U.S.S.G.] § 3B1.2. Clearly he thought the minimum guidelines range sentence of thirty months was excessive, but his expression of that feeling in no´ way demonstrates that he believed he was without authority to make a downward adjustment in Nichols's base offense level for a mitigating role in the conspiracy. The judge's comments reflect no error of any kind.

*Nichols,* 151 F.3d at 855 (emphasis added). Similarly, in *United States v. Eastman,* 149 F.3d 802 (8th Cir.1998), where the defendant argued that the district court had abused its discretion by not granting him a downward departure based on his "advanced age and poor health," the appellate court rejected the defendant's argument, for the following reason:

The district court acknowledged its *authority* to depart but concluded that the *facts* did not justify a downward departure. The court's discretionary refusal to grant a downward departure is unreviewable on appeal.

*Eastman,* 149 F.3d at 804–05 (emphasis added).

■ In short, a court has no discretion to depart until it has authority to do so; but where the court has the authority as a matter of law, its decision to depart or not to depart is a matter of discretion. Therefore, this court must first decide, as a question of law, whether it has the *authority* to grant the downward departures requested, by deciding whether, as a general principle, a disparity between districts in the availability of use immunity within the scope of § 1B1.8 protection, as a result of routine, discretionary practices of prosecutors in each district, *is of a kind or degree* that may appropriately be relied upon to justify departure. *See, e.g., Maxwell,* 25 F.3d at 1400. If the court finds that it does indeed have such authority, it must examine the facts in the individual defendants' cases to decide, as a matter of discretion, whether those facts justify a downward departure. *See, e.g., Eastman,* 149 F.3d at 804–05.

### 3. *Analytical process*

The Supreme Court explained in *Koon v. United States,* 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), the process the district court must follow before making a departure from the Guidelines:

The Commission's treatment of departure factors led then-Chief Judge Breyer to explain that a sentencing court considering a departure should ask the following questions:

"1) What features of this case, potentially, take it outside the Guidelines' 'heartland' and make of it a special, or unusual, case?

"2) Has the Commission forbidden departures based on those features?

"3) If not, has the Commission encouraged departures based on those features?

"4) If not, has the Commission discouraged departures based on those features? *United States v. Rivera,* 994 F.2d 942, 949 (C.A.1 1993).

We agree with this summary. If the special factor is a forbidden factor, the sentencing court cannot use it as a basis for departure. If the special factor is an encouraged factor, the court is authorized to depart if the applicable Guideline does not already take it into account. If the special factor is a discouraged factor, or an encouraged factor already taken into account by the applicable Guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present. *Cf. ibid.* If a factor is unmentioned in the Guidelines, the court must, after considering the "structure and theory of both relevant individual guidelines and the Guidelines taken as a whole," *ibid.,* decide whether it is sufficient to take the case out of the Guideline's heartland. The court must bear in mind the Commission's expectation that departures based on grounds not mentioned in the Guidelines will be "highly infrequent." 1995 U.S.S.G. ch. 1, pt. A, p. 6.

*Koon,* 518 U.S. at 95–96, 116 S.Ct. 2035; *Diaz–Diaz,* 135 F.3d at 580 (requiring the same analysis and observing that " '[t]he court must bear in mind the Commission's expectation that departures based on grounds not mentioned in the Guidelines will be highly infrequent.' ") (quoting *Koon,* 518 U.S. at 96, 116 S.Ct. 2035; *and compare Woods,* 159 F.3d at 1134 (outlining a similar analysis).

■ Thus, the degree to which the Guidelines forbid, encourage, discourage, or fail to mention consideration of a particular factor determines the manner in which the court must determine whether a

departure is permitted in the particular case. *See id.* (explaining the proper consideration when a factor is discouraged, encouraged, or unmentioned); *see also Woods,* 159 F.3d at 1134 (same); *United States v. Hildebrand,* 152 F.3d 756, 767 (8th Cir.) ("Because age is a discouraged factor, departure is permissible 'only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present.'") (quoting *Koon,* 518 U.S. at 96, 116 S.Ct. 2035), *cert. denied sub nom. Webb v. United States,* —— U.S. ——, 119 S.Ct. 575, 142 L.Ed.2d 479 (1998); *United States v. Morken,* 133 F.3d 628, 629 (8th Cir.1998) (if departure is sought on the basis of a discouraged factor, "the district court's decision to depart [is] proper only if [the defendant's conduct] w[as] exceptional or 'in some other way ... different from the ordinary case.'") (quoting *Koon,* 518 U.S. at 96, 116 S.Ct. 2035); *United States v. Wong,* 127 F.3d 725, 728 (8th Cir.1997) ("If a factor is unmentioned by the Sentencing Guidelines, the court may use it only if it determines, after taking into consideration the structure and theory of relevant Guidelines and the Sentencing Guidelines as a whole, that the factor is sufficient to 'take the case out of the Guideline's heartland.'") (quoting *Koon,* 518 U.S. at 95–96, 116 S.Ct. 2035). Furthermore, it is not enough that a factor was not taken into consideration by the Commission; the factor must "also be one for which a sentence outside the guidelines 'should result.'" *United States v. Maxwell,* 25 F.3d 1389, 1400–01 (8th Cir.), *cert. denied,* 513 U.S. 1031, 115 S.Ct. 610, 130 L.Ed.2d 519 (1994). Finally, the Eighth Circuit Court of Appeals has warned that "[a] district court should endeavor to be extremely clear in articulating the factors upon which it bases a departure from the Guidelines." *United States v. Merrival,* 176 F.3d 1079, 1081 (8th Cir.1999).

## B. *Authority To Depart*

The court now turns to the question of its authority to depart from the Sentencing Guidelines on the basis asserted, disparity between districts in the availability of "use immunity" within the scope of U.S.S.G. § 1B1.8 protection. That question is answered by applying the analysis described above, as outlined in *Koon,* 518 U.S. at 95–96, 116 S.Ct. 2035.

### 1. *A feature that potentially takes the case "outside the 'heartland'"*

■ As noted above, the first step in the determination of whether a downward—or, for that matter, an upward—departure is warranted is to ask, "What features of this case, potentially, take it outside the Guidelines' 'heartland' and make of it a special, or unusual, case?" *Koon,* 518 U.S. at 95, 116 S.Ct. 2035. It appears from both *Koon* and U.S.S.G. § 5K2.0 that the "potential" exists if "certain aspects of the case [are] unusual enough." *Koon,* 518 U.S. at 98, 116 S.Ct. 2035; U.S.S.G. § 5K2.0; *see also United States v. Allery,* 175 F.3d 610, 613 (8th Cir.1999) ("It is apparent to us that the highly unusual factual circumstances of this case were such that it was not an abuse of discretion to hold that the case lay outside the heartland of those cases for which the guideline applicable here was intended."); *United States v. O'Kane,* 155 F.3d 969, 975 (8th Cir.1998) ("To justify departure, a 'case must be found unusual enough for it to fall outside the heartland of cases in the Guideline.'") (quoting *Koon,* 518 U.S. at 98, 116 S.Ct. 2035); *United States v. Saelee,* 123 F.3d 1024, 1026 (8th Cir.1997) (where the district court correctly understood its discretionary authority to depart rested upon a determination that circumstances of the case make it "exceptional" and "atypical," such that it is outside the heartland of cases, its decision not to exercise such authority is unreviewable).

The defendants assert that disparate employment of use immunity, as provided in U.S.S.G. § 1B1.8, in plea bargaining among federal districts is unusual enough to be a feature that potentially takes this case "outside of the Guidelines' 'heartland.'" The defendants rely primarily on

the decision of the Ninth Circuit Court of Appeals in *United States v. Banuelos–Rodriguez*, 173 F.3d 741 (9th Cir.1999), in support of their position. However, on November 8, 1999, shortly before the consolidated hearing in these cases, the government filed another supplement to the record advising the court that the panel decision of the Ninth Circuit Court of Appeals in *Banuelos–Rodriguez* had been withdrawn pending rehearing *en banc*. *See United States v. Banuelos–Rodriguez*, 1999 WL 1016272 (9th Cir. Nov.5, 1999).

This court, however, need not rely exclusively, as the defendants do, on the decision of the Ninth Circuit Court of Appeals in *Banuelos–Rodriguez* in support of the proposition that disparities in plea bargaining between adjacent federal districts is a feature that potentially takes a case out of the "heartland." Instead, the court finds that a decision from our own Circuit Court of Appeals, *United States v. Jones*, 160 F.3d 473 (8th Cir.1998), recognized the potential for disparities in plea bargaining to take a case out of the "heartland."

In *Jones*, the Eighth Circuit Court of Appeals was presented with the question of the district court's authority to grant a downward departure where the government uses its discretion in plea bargaining to secure substantially reduced sentences for principals in a drug conspiracy in exchange for their testimony against lesser members of the conspiracy. *Jones*, 160 F.3d at 483. The court held that sentencing disparities among co-defendants arising from the exercise of such prosecutorial discretion in plea bargaining could provide the district court with the authority to depart from the Sentencing Guidelines. *Id.* (Heaney, J., concurring in part and writing the majority opinion in pertinent part). Specifically, the court held that, "to the extent that the government's behavior directly results in prejudice to a defendant, which is significant enough to take the case out of the heartland of the Sentencing Guidelines, district courts have the discretion to grant an appropriate downward departure." *Id.* The appellate court instructed that, "if the district court on re-

mand determines that any of the appellants were directly prejudiced by the government's conduct significantly enough to take the case out of the heartland of the Sentencing Guidelines, it may exercise its discretion in determining whether to grant an appropriate downward departure." *Id.* at 484. In other words, in the circumstances identified in *Jones*, the court has the *authority* to grant a downward departure, and may then exercise its discretion to grant or deny such a departure.

■ Although the court in *Jones* was considering disparities among co-defendants resulting from the exercise of prosecutorial discretion in plea bargaining, this court finds that *Jones* also supports the conclusion that district-to-district disparities resulting from prosecutorial discretion in plea bargaining can potentially take a case out of the "heartland" of the Sentencing Guidelines. *Id.; see also Koon*, 518 U.S. at 95, 116 S.Ct. 2035 (asking first, "What features of this case, potentially, take it outside the Guidelines' 'heartland' and make of it a special, or unusual, case?"). Whether that potential is realized depends, under *Jones*, on whether the government's behavior directly results in sufficient prejudice to a defendant, that is, prejudice to a defendant that is significant enough to take the case out of the heartland of the Sentencing Guidelines. *Id.*

■ Furthermore, the court agrees with the defendants that disparate employment of use immunity within the scope of U.S.S.G. § 1B1.8 protection in plea bargaining among federal districts is unusual enough to be a feature that potentially takes this case "outside of the Guidelines' 'heartland,'" at least where the *Jones* requirement of sufficient prejudice to the defendant is present. Although it is not unusual for a particular defendant to be given or denied use immunity, in the discretion of the prosecutor, thus making U.S.S.G. § 1B1.8 protection either operative or inoperative in a particular case, it *is* potentially unusual enough to take the case out of the Guidelines' "heartland" that the

routine practice in one district is to deny use immunity, while the practice in an adjacent district—and indeed the vast majority of federal districts—is to provide such immunity routinely. Again, "the sentencing guidelines are designed to achieve uniformity in federal sentencing." *Decora,* 177 F.3d at 678 (citing *Mistretta,* 488 U.S. at 367, 109 S.Ct. 647). A disparity in practice that makes a provision of the Guidelines inoperative in one district and operative in an adjacent district (indeed, in most districts) potentially takes the case out of the "heartland" of uniformity the Guidelines were designed to create and in which they ordinarily function.

Therefore, the court will turn to the next step in the analysis.

### 2. Treatment of the feature under the Guidelines

That next step in the analysis requires the court to consider whether the feature or factor at issue is one on which a departure is forbidden, discouraged, encouraged, or simply not mentioned in the Guidelines. *Koon,* 518 U.S. at 95–96, 116 S.Ct. 2035. The defendants again assert that a panel of the Ninth Circuit Court of Appeals held in *Banuelos–Rodriguez* that disparity in sentencing among federal districts arising from plea-bargaining policies of U.S. Attorneys is simply not a factor mentioned in the Sentencing Guidelines. *See Banuelos–Rodriguez,* 173 F.3d at 743. The government argues that use immunity is adequately considered in U.S.S.G. § 1B1.8, such that a departure on the basis of the discretionary denial of use immunity is forbidden.

### a. Does U.S.S.G. § 1B1.8 consider the feature?

This part of the court's analysis begins with the provision of the Sentencing Guidelines around which the controversy here revolves, U.S.S.G. § 1B1.8. Section 1B1.8 of the Sentencing Guidelines has the following to say about use for sentencing purposes of evidence immunized pursuant to a plea agreement:

### § 1B1.8. *Use of Certain Information*

■ (1) Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement.

(b) The provisions of subsection (a) shall not be applied to restrict the use of information:

(1) known to the government prior to entering into the cooperation agreement;

(2) concerning the existence of prior convictions and sentences in determining § 4A1.1 (Criminal History Category) and § 4B1.1 (Career Offender);

(3) in a prosecution for perjury or giving a false statement;

(4) in the event there is a breach of the cooperation agreement by the defendant; or

(5) in determining whether, or to what extent, a downward departure is warranted pursuant to a government motion under § 5K1.1 (Substantial Assistance to Authorities).

U.S.S.G. § 1B1.8. By its plain language, the guideline applies "only where two separate agreements have been negotiated: (1) the defendant agrees to cooperate with the government by providing the requisite information, and (2) the government agrees not to use that information against the defendant." *United States v. Roman–Zarate,* 115 F.3d 778, 781 (10th Cir.1997) (citing *United States v. Evans,* 985 F.2d 497, 499 (10th Cir.), *cert. denied,* 508 U.S. 965, 113 S.Ct. 2942, 124 L.Ed.2d 690 (1993)). As various Circuit Courts of Appeals have recognized, "[o]ne of § 1B1.8's most important advantages is that federal prosecutors can ... assure potential informants that their statements will in no way be used against them." *United States v.*

*Shorteeth,* 887 F.2d 253, 257 (10th Cir. 1989); *accord United States v. Bradbury,* 189 F.3d 200, 207 (2d Cir.1999) (quoting *Shorteeth* ); *United States v. Jarman,* 144 F.3d 912, 914 (6th Cir.1998) ("In *United States v. Miller,* 910 F.2d 1321 (6th Cir. 1990), *cert. denied,* 498 U.S. 1094, 111 S.Ct. 980, 112 L.Ed.2d 1065 (1991), this court held that § 1B1.8(a) 'unquestionably forbids the government to influence the sentencing range by disclosing revelations made by a defendant in the course of cooperation as required by a plea agreement.' *Id.* at 1325."); *United States v. Ivy,* 83 F.3d 1266, 1283 (10th Cir.) ("Although this guideline provision is critical for a number of reasons, one of its most important advantages is that it encourages codefendants to cooperate with the government by ensuring that their statements will not be used against them during sentencing.") (also citing *Shorteeth*), *cert. denied,* 519 U.S. 901, 117 S.Ct. 253, 136 L.Ed.2d 180 (1996).

More specifically,

Once the United States has agreed to a grant of immunity and the would-be defendant has testified, that testimony is useless against the testifier, and it may not be used to affect a subsequent sentence of the testifier (or allowed to affect conditions and terms of confinement). The Fifth Amendment to the Constitution, *see Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), and the Sentencing Guidelines, § 1B1.8 App. n. 1, require no less.

*United States v. Abanatha,* 999 F.2d 1246, 1249 (8th Cir.1993), *cert. denied,* 511 U.S. 1035, 114 S.Ct. 1549, 128 L.Ed.2d 199 (1994); *White v. United States,* 998 F.2d 572, 574 (8th Cir.1993) ("Section 1B1.8(a) of the Guidelines provides that a plea agreement stipulating that information supplied pursuant to the agreement will not be used against the defendant in sentencing, as this agreement does, will be honored.").

**8.** The Commentary to § 1B1.8 provides as follows:

*Commentary*

However, § 1B1.8 does not provide unlimited immunity for any information a cooperating defendant may provide. For example, "Subsection (b)(1) of the same Guideline states ... that this does not 'restrict use of information [ ] known to the government prior to entering the cooperation agreement', U.S.S.G. § 1B1.8(b)(1)." *White,* 998 F.2d at 573. Nor does this guideline preclude use of information obtained post-plea from the defendant in calculation of the defendant's criminal history category. *See United States v. Hewitt,* 942 F.2d 1270, 1276 (8th Cir.1991) (citing U.S.S.G. § 1B1.8(b)(2)). Other provisions of subsection (b) identify further uses that may be made of information disclosed by the defendant, even with the "use immunity" protection provided by subsection (a), including in subdivision (b)(5) an authorization to use such information "in determining whether, or to what extent, a downward departure from the guidelines is warranted pursuant to a government motion under § 5K1.1 (Substantial Assistance to Authorities)." *See* U.S.S.G. § 1B1.8(b). This mention of downward departure in subdivision (b)(5), however, is the sole reference in this guideline to the effect of the provision upon a downward departure; subsection (a) refers only to the unavailability of information disclosed pursuant to a "use immunity" agreement "in determining the applicable guideline range, except to the extent provided in the agreement." *See* U.S.S.G. § 1B1.8(a).

■■■ "[T]he official commentary to the guidelines must be given controlling weight unless it is plainly erroneous or inconsistent with the guideline." *United States v. Hendricks,* 171 F.3d 1184, 1186 (8th Cir.1999) (citing *Stinson v. United States,* 508 U.S. 36, 44–45, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993)). Therefore, the court has looked to the official commentary to § 1B1.8, set out in full in the margin,[8] for further guidance.

*Application Notes:*

*1. This provision does not authorize the government to withhold information from*

The official commentary explains that the guideline applies only where the defendant agrees to provide information about the criminal activities of *others*, not merely the defendant's own criminal activities. *See* U.S.S.G. § 1B1.8, Commentary, Application Notes 5 & 6 (as highlighted in the margin). Further, the commentary makes clear that a use immunity agreement prevents use of disclosed information to determine the guideline range or to depart *upward*, but it does not preclude use of disclosed information in determining whether to depart *downward*. *Id.* at Application Note 1 (as highlighted in the margin). However, nowhere does the official commentary discuss whether the disparate denial of use immunity pursuant to U.S.S.G. § 1B1.8 among federal districts is a ground for a departure from sentencing.

In sum, this guideline plainly considers what use may be made of immunized testimony in determining sentencing range, and does, as the government suggests, rec-

> the court but provides that self-incriminating information obtained under a cooperation agreement is not to be used to determine the defendant's guideline range. Under this provision, for example, if a defendant is arrested in possession of a kilogram of cocaine and, pursuant to an agreement to provide information concerning the unlawful activities of co-conspirators, admits that he assisted in the importation of an additional three kilograms of cocaine, a fact not previously known to the government, this admission would not be used to increase his applicable guideline range, except to the extent provided in the agreement. **Although the guideline itself affects only the determination of the guideline range, the policy of the Commission, as a corollary, is that information prohibited from being used to determine the applicable guideline range shall not be used to increase the defendant's sentence above the applicable guideline range by upward departure.** In contrast, subsection (b)(5) provides that consideration of such information is appropriate in determining whether, and to what extent, a downward departure is warranted pursuant to a government motion under § 5K1.1 (Substantial Assistance to Authorities); e.g., a court may refuse to depart below the applicable guideline range on the basis of such information.
>
> 2. Subsection (b)(2) prohibits any cooperation agreement from restricting the use of information as to the existence of prior convictions and sentences in determining adjustments under § 4A1.1 (Criminal History Category) and § 4B1.1 (Career Offender). The Probation Service generally will secure information relevant to the defendant's criminal history independent of information the defendant provides as part of his cooperation agreement.
>
> 3. On occasion the defendant will provide incriminating information to the government during plea negotiation sessions be-
> fore a cooperation agreement has been reached. In the event no agreement is reached, use of such information in a sentencing proceeding is restricted by Rule 11(e)(6) (Inadmissibility of Pleas, Plea Discussions, and Related Statements) of the Federal Rules of Criminal Procedure and Rule 410 (Inadmissability of Pleas, Plea Discussions, and Related Statements) of the Rules of Evidence.
>
> 4. As with the statutory provisions governing use immunity, 18 U.S.C. § 6002, this guideline does not apply to information used against the defendant in a prosecution for perjury, giving a false statement, or in the event the defendant otherwise fails to comply with the cooperation agreement.
>
> 5. **This guideline limits the use of certain incriminating information furnished by a defendant in the context of a defendant-government agreement for the defendant to provide information concerning the unlawful activities of other persons.** The guideline operates as a limitation on the use of such incriminating information in determining the applicable guideline range, and not merely as a restriction on the government's presentation of such information (e.g., where the defendant, subsequent to having entered into a cooperation agreement, provides such information to the probation officer preparing the presentence report, the use of such information remains protected by this section).
>
> 6. **Unless the cooperation agreement relates to the provision of information concerning the unlawful activities of others, this guideline does not apply (i.e., an agreement by the defendant simply to detail the extent of his own unlawful activities, not involving an agreement to provide information concerning the unlawful activity of another person, is not covered by this guideline).**

U.S.S.G. § 1B1.8, Commentary (emphasis added).

ognize that the government has the discretion to offer or withhold such use immunity. However, nowhere does this guideline address whether *denial* of use immunity has any impact on sentencing range, let alone whether denial of use immunity—or a disparity between districts in the availability of use immunity—is discouraged, encouraged, or prohibited as a ground for downward departure. *See Koon*, 518 U.S. at 95–96, 116 S.Ct. 2035 (second step of departure analysis is to determine whether the factor that potentially takes the case out of the "heartland" is a prohibited, discouraged, encouraged, or "unmentioned" ground for departure under the Sentencing Guidelines).

### b. Is the feature considered or unmentioned?

Not only does U.S.S.G. § 1B1.8 not consider denial of use immunity—or disparate denial of use immunity among federal districts as a matter of routine practice or policy—in such a way as to preclude its use as a basis for a downward departure, this feature is not among the "prohibited" factors, such as the defendant's race, creed, sex, religion, national origin, or socio-economic status, identified in U.S.S.G. § 5H1.10, and *Wong*, 127 F.3d at 727–28. It is not among the "encouraged" factors, such as victim provocation, coercion and duress, and the defendant's diminished capacity, identified in U.S.S.G. §§ 5K2.10, 5K2.12, 5K2.13, and *Wong*, 127 F.3d at 727–28. Nor is it among the "discouraged" factors, such as physical appearance or education and vocational skills, identified in U.S.S.G. §§ 5H1.4 and 5H1.2, respectively. The court therefore concludes that the specific feature at issue here—disparate availability among districts of use immunity pursuant to U.S.S.G. § 1B1.8—is a feature that is neither discouraged, encouraged, or prohibited as a ground for downward departure, but is instead simply "unmentioned" in the Guidelines. *Koon*, 518 U.S. at 95–96, 116 S.Ct. 2035.

Consequently, the court proceeds to the analysis of the sufficiency of this "unmentioned" factor as a ground for downward departure.

### 3. Sufficiency of the feature to take the case out of the heartland

When a feature or factor is "unmentioned," the court must, "after considering the 'structure and theory of both relevant individual guidelines and the Guidelines taken as a whole,' decide whether it is sufficient to take the case out of the Guideline's heartland." *Koon*, 518 U.S. at 95–96, 116 S.Ct. 2035 (internal citation omitted); *Wong*, 127 F.3d at 728. Again, it is not enough that a factor was not taken into consideration by the Commission; the factor must "also be one for which a sentence outside the guidelines 'should result.'" *Maxwell*, 25 F.3d at 1400–01.

Although the government steadfastly argues that disparate availability of use immunity is a factor already adequately considered by the Sentencing Commission—an argument rejected just above—the government also argues that consideration of the guidelines as a whole shows that a departure on this basis is inappropriate. The government argues that courts have generally been reluctant to base a departure on differences in sentencing resulting from the exercise of prosecutorial discretion. The government also argues that granting any of these defendants a downward departure on the basis of the government's denial of use immunity would circumvent the government's prerogative to move for a downward departure for a defendant's substantial assistance under U.S.S.G. § 5K1.1. The defendants argue, however, that a departure on this ground is warranted, again citing *Banuelos–Rodriguez*, 173 F.3d at 744–45.

### a. Disparities arising from prosecutorial discretion

The government is correct that the Circuit Courts of Appeals have often rejected downward departures on the basis of sentence disparities arising from the exercise of prosecutorial discretion or plea bargaining of co-defendants. *See, e.g., Wong*, 127 F.3d at 728 ("This Court has held that

'[d]isparity between sentences imposed on codefendants is not a proper basis for departure.'") (quoting *United States v. Polanco,* 53 F.3d 893, 897 (8th Cir.1995), *cert. denied,* 518 U.S. 1021, 116 S.Ct. 2555, 135 L.Ed.2d 1073 (1996)); *accord United States v. Snyder,* 136 F.3d 65, 70 (1st Cir.1998) ("[W]e hold that federal/state sentencing disparity is not a feature that can justify a departure. Such departures would contradict hopelessly the guidelines' structure and theory as well as impinge impermissibly upon the Executive Branch's discretion to prosecute defendants under federal law."); *United States v. Perkins,* 108 F.3d 512, 515 (4th Cir.1997) ("Under the law of this circuit, disparate sentences among codefendants is an impermissible ground for departure."); *United States v. Clark,* 8 F.3d 839, 842 (D.C.Cir.1993) ("We have already rejected the claim that the government's 'arbitrary use' of its discretion to indict defendants under either federal or D.C. law could be a mitigating circumstance within the meaning of § 3553(b)," citing *United States v. Dockery,* 965 F.2d 1112, 1117 (D.C.Cir. 1992)). Such disparities are often seen as byproducts of the function of the Sentencing Guidelines, and thus no ground for departure. *See, e.g., id.* ("Though one of the congressional goals in enacting the Sentencing Guidelines was the promotion of proportional and uniform sentences, some disparity will inevitably exist because of the unique facts of each individual defendant's case."); *see also Jones,* 160 F.3d at 483 (describing sentencing disparities among co-defendants on the basis of plea agreements as an "anomalous byproduct of the Sentencing Guidelines" that is "generally endorsed" by the courts).[9]

9. One example of such an "anomalous byproduct" is the dramatic discrepancy among the federal districts in the frequency with which "substantial assistance" departures are made pursuant to U.S.S.G. § 5K1.1(a) matter entirely dependent upon prosecutorial discretion, as no such departure can be made without an "enabling" motion from the government. *See* U.S.S.G. § 5K1.1 (authorizing the reduction only "[u]pon motion of the government...."). Information compiled by the United States Sentencing Commission indicates that, for 1998, substantial assistance departures ranged from a high of 43.6% of cases in the Western District of North Carolina to a low of 1.7% of cases in the District of Alaska. UNITED STATES SENTENCING COMMISSION, 1998 SOURCEBOOK OF FEDERAL SENTENCING STATITICS, Table 26, 53–55. Our own circuit has the dubious distinction of the widest range of disparity in substantial assistance reductions in a single circuit, from 43.1% of cases in the Western District of Missouri down to 6.7% of cases in the District of South Dakota. *Id.* at 54. The widest range within a single state is in Illinois, which ranges from 34.2% of cases in the Central District down to 9.1% of cases in the Southern District. *Id.* Thus, a defendant in the Western District of North Carolina is over twenty-five times more likely to get a substantial assistance reduction than a defendant in the District of Alaska; a defendant in the Western District of Missouri is over six times more likely to get a substantial assistance reduction than a defendant in the District of South Dakota (although worse differ-

ences in terms of probability exist in the Ninth Circuit, where a defendant in Guam is over twenty times more likely to get a substantial assistance reduction than a defendant in the District of Alaska; and a defendant in the Central District of Illinois is about 3.75 times more likely to get a substantial assistance reduction than a defendant in the Southern District of Illinois (although worse differences in probability exist in Kentucky, where a defendant in the Eastern District is about 3.9 times more likely to get a substantial assistance reduction than a defendant in the Western District). Although other factors may influence these discrepancies, there is no escaping the fact that they are due at least in substantial part to the exercise of discretion by prosecutors. These discrepancies suggest that sentencing disparities are probably at least as common, if not more pronounced, under the Sentencing Guidelines than they were before the Sentencing Guidelines were instituted.

Of further concern is the conclusion of an analysis of equity in substantial assistance reductions, published by the United States Sentencing Commission in January of 1998, that "the evidence consistently indicated that factors that were associated with either the making of a § 5K1.1 motion and/or the magnitude of the departure were not consistent with principles of equity." LINDA DRAZGA MAXFIELD & JOHN H. KRAMER, SUBSTANTIAL ASSISTANCE: AN EMPIRICAL YARDSTICK GAUGING EQUITY IN CURRENT FEDERAL POLICY AND PRACTICE 21 (Jan. 1998). Instead, the analysts found that "ex-

However, various Circuit Courts of Appeals, including our own, have also expressed their discomfort with such sentence disparities, even among co-defendants. *See, e.g., Jones,* 160 F.3d at 483; *United States v. Meza,* 127 F.3d 545, 549–50 (7th Cir.1996) (holding that an "unjustified disparity" can provide a basis for a departure from the guidelines, and explaining that a disparity is "unjustified" when it does not arise from the proper operation of the sentencing guidelines), *cert. denied,* 522 U.S. 1139, 118 S.Ct. 1103, 140 L.Ed.2d 157 (1998). Thus, this court cannot conclude out of hand that the disparity here does not warrant departure, simply because it arises from an exercise of prosecutorial discretion.

### b. The panel decision in Banuelos–Rodriguez

The defendants are correct that in *United States v. Banuelos–Rodriguez,* 173 F.3d 741 (9th Cir.1999), upon review of the factors identified in *Koon,* a panel of the Ninth Circuit Court of Appeals was "convinced" that "sentencing disparities among federal districts based on U.S. Attorneys' plea-bargaining practices can be a ground for departure in the appropriate case." *Banuelos–Rodriguez,* 173 F.3d at 743. In that case, the court examined disparate plea-bargaining treatment among the federal districts of California of deported aliens charged under 8 U.S.C. § 1326. *See id.* at 742. The record suggested that aliens arrested for violations of § 1326 in the Eastern, Northern, and Southern Districts of California were frequently put on a "fast track" plea-bargaining process, while those arrested in the Central District were not. *Id.* at 742–44. A defendant arrested on this charge in the Central District could therefore face a sentence that could more than triple his or her federal sentence for violating § 1326, where "the single most influential factor"

was the location of his or her arrest. *Id.* at 744–45. The Ninth Circuit Court of Appeals concluded that the applicable guideline, U.S.S.G. § 2L1.2, "certainly does not take account of that variable." *Id.* at 745.

Because the factor was "unmentioned," the panel then considered whether a downward departure on the basis of this disparity conflicted with the structure and theory of the Sentencing Guidelines, taken as a whole. *Id.* The court concluded that the central goal of the Sentencing Guidelines was to avoid sentencing disparity. *Id.* Consequently,

> Federal sentences that triple in severity solely because of the federal district in which the alien is convicted frustrate congressional intent to secure reasonable uniformity in sentencing. In this case, similar, contiguous federal districts employ radically different plea bargaining policies in otherwise-similar cases. The disparity in sentences, the similarities of the districts involved, and the close proximity of those districts are factors that persuade us that a downward departure may be warranted in this case.

*Banuelos–Rodriguez,* 173 F.3d at 745.

The panel in *Banuelos–Rodriguez* found no bar in one of its own prior decisions, *United States v. Mejia,* 953 F.2d 461 (9th Cir.1991), *as amended,* Mar. 5, 1992, *cert. denied,* 504 U.S. 926, 112 S.Ct. 1983, 118 L.Ed.2d 581 (1992), which prohibited a downward departure to avoid unequal treatment of co-defendants. *Banuelos–Rodriguez,* 173 F.3d at 746. The panel opinion explained:

> Mejia's sentence achieved greater uniformity with other sentences generally, and departing to account for the disparity vis-a-vis his codefendant's sentence would have created a greater disparity. In this case, by contrast, the disparity is

---

pected factors," such as type and benefit of cooperation, defendant culpability or function, relevant conduct, and offense type, were "inadequate in explaining § 5K1.1 depar-

tures," while "worrisome, legally irrelevant factors," such as gender, race, ethnicity, and citizenship, were "statistically significant" in explaining such departures. *Id.*

between the Central District of California's treatment of § 1326 defendants and the treatment accorded such defendants elsewhere in California. This greater disparity trumps whatever lesser uniformity there may be in how similarly situated defendants are treated within the Central District. Indeed, the differing § 1326 plea-bargaining policies of U.S. Attorneys in California result in a systemic sentencing disparity that is "'highly infrequent'" among federal crimes. *Koon,* 518 U.S. at 96, 116 S.Ct. at 2045 (quoting U.S.S.G. Ch. 1, Pt. A).

The validity of *Mejia* after the Supreme Court's decision in *Koon* may be questionable. In *Koon,* the Court cautioned federal courts against categorically prohibiting factors as bases for departure when the factors are not discussed in the Sentencing Guidelines. 518 U.S. at 106–07, 116 S.Ct. at 2050. To the extent *Mejia* might be read to forbid consideration of sentencing disparity among co-defendants, such a categorical prohibition arguably is inconsistent with *Koon. See United States v. Sanchez–Rodriguez,* 161 F.3d 556, 560–61 (9th Cir.1998) (*en banc*) ("*Koon* made it clear that we cannot categorically forbid a district court from departing downward on any basis except for those specifically proscribed in the Guidelines.") (footnote and citations omitted).

*Banuelos–Rodriguez,* 173 F.3d at 746. Therefore, the panel concluded as follows:

Gross sentencing disparities among similar contiguous federal districts because of different plea-bargaining policies of U.S. Attorneys in § 1326 prosecutions may be a valid ground for departure. The district court was incorrect when it held that this was not a proper factor to be considered for a departure. We remand so that the district court may exercise its discretion and determine

whether the unique circumstances of Banuelos–Rodriguez's case cause it to fall outside of the Sentencing Guidelines' "heartland."

*Banuelos–Rodriguez,* 173 F.3d at 746.

The government points out that the panel decision of the Ninth Circuit Court of Appeals in *Banuelos–Rodriguez* has been withdrawn pending rehearing *en banc. See United States v. Banuelos–Rodriguez,* 195 F.3d 454 (9th Cir.1999). The government also asserts that, even if the *en banc* court were to adhere to the panel's decision in *Banuelos–Rodriguez,* that case is distinguishable, because the holding of the case was narrowly confined to prosecutions under 8 U.S.C. § 1326.[10]

This court is aware that, thus far, only the Ninth Circuit Court of Appeals has expressly applied the reasoning and holding of *Banuelos–Rodriguez,* and then only in cases involving disparate plea-bargaining with regard to offenses under 8 U.S.C. § 1326. *See United States v. Martinez–Ramos,* 184 F.3d 1055 (9th Cir.1999). Continued application of the panel decision in *Banuelos–Rodriguez,* even in the Ninth Circuit, however, may end after *en banc* review. Thus, although the defendants relied largely—indeed, almost exclusively—on the panel decision in *Banuelos–Rodriguez,* it would not be appropriate for this court to do so.

**c. The Jones decision**

Even were its continued viability in the Ninth Circuit assured, the panel decision in *Banuelos–Rodriguez* would be of less importance than any decision from the Court of Appeals from this Circuit providing appropriate guidance. The decision of the Eighth Circuit Court of Appeals in *United States v. Jones,* 160 F.3d 473 (8th

**10.** The government also asserts that the panel decision in *Banuelos–Rodriguez* is distinguishable, because the panel found that the sentencing factor at issue there was not considered by the Sentencing Guidelines, but the factor present here has been adequately considered. As noted above, this court rejects the argument that the Sentencing Guidelines have adequately considered the effect of denial or disparate denial between districts of use immunity pursuant to U.S.S.G. § 1B1.8 as a basis for downward departure.

Cir.1998), is such a decision. In *Jones*, the Eighth Circuit Court of Appeals found that certain disparities arising from the exercise of prosecutorial discretion in plea bargaining *do* provide an appropriate basis for downward departure:

> [W]e note that this case exemplifies an emerging trend in which the government secures a substantially reduced sentence for the principals of a drug conspiracy in exchange for their testimony against lesser members of the conspiracy. This trend generally results in the principals receiving substantially lower sentences than the lesser members and is yet another example of how the Sentencing Guidelines have transferred the discretion once held by judges to the government. While courts generally endorse this anomalous byproduct of the Sentencing Guidelines, *to the extent that the government's behavior directly results in prejudice to a defendant, which is significant enough to take the case out of the heartland of the Sentencing Guidelines, district courts have the discretion to grant an appropriate downward departure.*

*Jones*, 160 F.3d at 483 (Heaney, J., concurring in part and writing for the majority in pertinent part) (emphasis added).

In *Jones*, the appellate court noted that defendant Cashaw received a sentence of 360 months, while another defendant, Rashid, "far and away the kingpin of the conspiracy, originally faced a sentence of 360 months to life which was ultimately reduced to 60 months for his cooperation in testifying against the lesser members of the conspiracy." *Id.* The appellate court also noted the sentencing judge's dissatisfaction with this situation:

> At Cashaw's sentencing, the district court responded to Cashaw's request for a downward departure:
>
>> [T]his simply isn't fair and doesn't make a lot of sense and I agree with that but I unfortunately, or maybe fortunately, cannot be responsible for the actions of other judges in other cases. And the fact that there may be some apparent inconsistencies is

something that a court of higher authority than mine is going to have to address.

(Sentencing Tr. at 3.) In addition, the district court stated that "I am personally offended by the differences that the law dictates in these sentences but there is nothing I can do about it." (Sentencing Tr. at 76.)

*Jones*, 160 F.3d at 483. While acknowledging that sentence disparities among co-conspirators do not provide a basis for departure, the appellate court nonetheless found that there were circumstances in which the district court *could* do something about such disparities in sentences:

> In promulgating § 3B1.1, the Sentencing Commission included managerial adjustments "primarily because of concerns about relative responsibility." U.S.S.G. § 3B1.1, comment. (backg'd); *see also United States v. Rodriguez*, 112 F.3d 374, 377 (8th Cir.1997) ("The adjustment for being an organizer or leader is intended to reflect relative responsibility compared to other participants in the crime."). While the Sentencing Guidelines apportion sentences based at least in part on the relative responsibility of each conspirator in a conspiracy, "dissatisfaction with the available sentencing range or a preference for a different sentence than that authorized by the guidelines is not an appropriate basis for a sentence outside the applicable guideline range." U.S.S.G. § 5K2.0, comment. *Thus, a district court does not have the discretion to grant a downward departure if its only objection is the disparity of sentences between co-conspirators. However, where the government's conduct directly results in prejudice to a defendant, which is significant enough to take the case out of the heartland of the guidelines, the district court has the discretion to impose a downward departure. See United States v. Lopez*, 106 F.3d 309, 311 (9th Cir.1997) (Lay, J.) (citing *Koon v. Unit-*

*ed States,* 518 U.S. 81, 116 S.Ct. 2035, 2046, 135 L.Ed.2d 392 (1996)). *Jones,* 160 F.3d at 483–84 (emphasis added).

▮ As this court reads *Jones,* the decision establishes the circumstances under which the district court has the *authority,* in its *discretion,* to grant a downward departure based on practices of prosecutors in plea bargaining. The discretion to depart exists—the authority is present, and it is up to the court, in its discretion, to decide whether or not to grant the departure—when "the government's behavior directly results in prejudice to a defendant, which is significant enough to take the case out of the heartland of the Sentencing Guidelines." *Jones,* 160 F.3d at 483. Therefore, under the circumstances identified in *Jones,* a downward departure on the basis of disparities in sentencing that arise from the exercise of prosecutorial discretion in plea bargaining does not conflict with "the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole." *See Koon,* 518 U.S. at 95–96, 116 S.Ct. 2035.

#### d. *Conflict with the structure and theory of the guidelines*

Even with the guidance provided by *Jones,* this court deems it appropriate to make a more specific determination of whether the downward departure contemplated here conflicts with the structure and theory of the Sentencing Guidelines, considering certain guidelines individually and the guidelines as a whole, in light of the arguments of the parties. *Koon,* 518 U.S. at 95–96, 116 S.Ct. 2035. The government asserts that the downward departure sought by the defendants would indeed conflict with the individual "substantial assistance" and "safety valve" guidelines, and with the guidelines taken as a whole.

#### i. *Conflict with the "substantial assistance" guideline.* The government argues that a downward departure of the kind at issue here would conflict with the individual guideline permitting the govern-

ment to recommend a downward departure for substantial assistance, U.S.S.G. § 5K1.1. The government seems to suggest that granting a downward departure on the basis of disparate denial of use immunity within the scope of § 1B1.8 protection would be a backdoor way for the court to grant a downward departure even though the defendant has failed to fulfill the requirements for a "substantial assistance" reduction and the government has therefore declined to make a motion for such a reduction pursuant to § 5K1.1. In other words, the government seems to be arguing that a defendant shouldn't be able to get the equivalent of a substantial assistance reduction when he or she hasn't provided substantial assistance.

The court agrees that a downward departure based on the unavailability in this district of § 1B1.8 protection should not provide the equivalent of a reduction for substantial assistance when no such assistance has been provided, but the court does not agree that this is what a downward departure based on disparate availability of § 1B1.8 protection—in the district denying such protection—would necessarily do.

The court recognizes that use immunity under § 1B1.8 and substantial assistance under § 5K1.1 are "related" to the extent that both relate to a defendant's provision of information about the criminal conduct of *others.* *Compare* U.S.S.G. § 1B1.8 ("Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of *others* .... ") (emphasis added), § 1B1.8, Notes 5 & 6 (same); *with* § 5K1.1 ("Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of *another person* .... ") (emphasis added). However, that does not mean that a downward departure based on the unavailability in this district of § 1B1.8 protection would improperly interfere with the operation of § 5K1.1.

The interplay between § 1B1.8 and § 5K1.1 is instructive. The Sentencing Guidelines clearly contemplate that a defendant could obtain the benefits of both § 1B1.8 and § 5K1.1, because a defendant who obtains use immunity in a plea agreement, and consequently provides information about the criminal activity of others, could obtain immunization, pursuant to § 1B1.8, from an upward departure based on the information provided, as well as a *reduction* in sentence for substantial assistance pursuant to § 5K1.1. Indeed, this is exactly what occurs in the Southern District of Iowa and, as the court understands it, in the vast majority of the 94 federal districts.

In contrast, a defendant's *inability* to obtain use immunity within the scope of § 1B1.8 protection may well *preclude* a substantial assistance motion for that defendant pursuant to § 5K1.1, because the additional sentencing exposure to the defendant arising from non-immunized disclosures could more than offset any benefit to that defendant from a substantial assistance motion, and thus chill the defendant's willingness to cooperate with prosecutors. Such a chill is, of course, directly contrary to the purpose of U.S.S.G. § 1B1.8 itself, which was adopted "to facilitate cooperation agreements...." U.S.S.G. Appendix C, amend. 5 (stating the purpose of the amendment adding U.S.S.G. § 1B1.8). Furthermore, where the defendant provides substantial assistance without the benefit of § 1B1.8 protection for disclosures that also incriminate the defendant, a "substantial assistance" reduction would often begin from a different point, the sentencing level as increased by the defendant's own disclosures. In short, § 1B1.8 protection merely maintains the starting point for a § 5K1.1 reduction, while the absence of § 1B1.8 protection likely moves the starting point for a § 5K1.1 reduction higher than it would otherwise be.

 The lesson is this: Where unprotected disclosures during cooperation do in fact increase the defendant's sentencing level, a downward departure based on an absence of § 1B1.8 protection as a result of routine prosecutorial practice in the district should do no more than return the defendant to the *status quo ante* any disclosures—the defendant's sentencing level based on information known to the government before any disclosures—thus leaving intact the entire potential benefit of the government's discretionary substantial assistance motion, as measured from the point at which protection of § 1B1.8 is either granted or denied. In contrast, a downward departure based on the absence of § 1B1.8 protection that placed the defendant in a position better than the defendant would have enjoyed before any disclosures could circumvent the government's discretion to move for a substantial assistance reduction. This is so, because such a downward departure would move the "starting point" for a substantial assistance reduction below the defendant's sentencing level based on information known to the government before any disclosures, thus stealing part of the "carrot" the government offers for substantial assistance.

It seems to the court, however, that a system permitting downward departures on the ground asserted would be "self-regulating": If the court routinely departs too far downward, the government would likely withhold substantial assistance motions, which in turn would likely chill the cooperation of defendants; however, the lack of cooperation by defendants would hamper the government's investigation and prosecution of others, which should prevent the government from knee-jerk denial of substantial assistance motions when otherwise warranted, even where the defendant also seeks a downward departure based on the practical absence of § 1B1.8 protection.

What prosecutors in the Northern District of Iowa would admittedly lose if a properly measured downward departure is made based on the absence of § 1B1.8 protection is the power to put an extra "squeeze" on a defendant, who must pro-

vide more valuable assistance the more deeply he incriminates himself. However, that extra "squeeze," it seems to this court, is contrary to the theory of the Sentencing Guidelines, as expressed in U.S.S.G. § 5K1.2, which states that "[a] defendant's refusal to assist authorities in the investigation of other persons may not be considered as an aggravating sentencing factor."

It should be apparent, as well, from the discussion of the interplay between § 1B1.8 and § 5K1.1 that what puts a "kink" in the Sentencing Guidelines is not the court's downward departure for denial of U.S.S.G. § 1B1.8 protection as a matter of district practice, but the government's virtually certain denial of § 1B1.8 protection. Again, the denial of § 1B1.8 protection likely moves the "starting point" for any § 5K1.1 reduction away from the point contemplated under properly functioning guidelines. Furthermore, § 1B1.8 protection is contemplated by the Sentencing Commission as part of the structure of the guidelines, which also rewards "substantial assistance" and "debriefing," the availability of which may, as a practical matter, depend upon the availability of § 1B1.8 protection.

The exception to the general rule that disclosures will often increase a defendant's sentencing range, if the defendant is denied the protections of § 1B1.8, is the situation in which the defendant is no worse off for making disclosures, *i.e.,* where the government already knows everything necessary to establish the defendant's enhanced sentencing level without the defendant's disclosures. Such a defendant has lost nothing from the lack of § 1B1.8 protection, although that defendant may still have something to gain from providing substantial assistance.

The court does not believe that a downward departure on the basis asserted here would conflict with § 5K1.1. *See Koon,* 518 U.S. at 95–96, 116 S.Ct. 2035 (considering whether a departure conflicts with individual guidelines). A downward departure restoring the effect of § 1B1.8, where its

protections have been eliminated as a matter of routine prosecutorial practice in the district, does no more than take the defendant back to the point from which any § 5K1.1 reduction would ordinarily have begun. Thus, where the conduct of the government precludes § 1B1.8 protection, and thereby either precludes a "substantial assistance" reduction or moves the "starting point" for such a reduction higher—as it might for a defendant who cooperates notwithstanding the lack of § 1B1.8 protection—a downward departure based on the absence of § 1B1.8 protection does not circumvent the "substantial assistance" guideline, but would instead place the defendant's sentence more in line with the sentence contemplated by the structure and theory of the guidelines taken as a whole.

***ii. Conflict with the "safety valve" guideline.*** The government argues further that "safety valve" eligibility is treated separately from use immunity, so that U.S.S.G. § 1B1.8 has no general application to the "safety valve" guideline, U.S.S.G. § 5C1.2. However, the government argues that a downward departure based on the absence of § 1B1.8 protection would circumvent the operation of the "safety valve" by giving a defendant "safety valve" protection when the defendant hasn't provided debriefing as required by that guideline.

The court finds that the government's first premise is flawed, in that there is a substantial potential interrelationship between denial of § 1B1.8 protection and the availability of a "safety valve" reduction under § 5C1.2. It is readily apparent that denial of "use immunity" is just as likely to chill a defendant's desire or ability to debrief as required for "safety valve" relief under U.S.S.G. § 5C1.2(5) as it is to chill the defendant's ability to provide "substantial assistance" as required under § 5K1.1: For the same reasons denial of use immunity may create sentencing exposure that at least potentially outweighs any benefit to be gained from a "substantial assis-

tance" motion pursuant to § 5K1.1, the increased sentencing exposure may also outweigh the benefits of a "safety valve" reduction. It is naive to assert that, because "use immunity" only applies to cooperation concerning the criminal activities of *others,* it has no application to a defendant's debriefing concerning his or her own criminal activities under the "safety valve." *See* U.S.S.G. § 5C1.2(5) (requiring debriefing "concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan"). The interrelationship between debriefing concerning one's own criminal conduct and providing information about the criminal activities of others should be obvious—at least where the offense charged involves concerted activity or requires different links in a chain of criminal activities, such as drug distribution. Were the connection not obvious, no "use immunity" would be necessary for providing information concerning the activities of *others* to facilitate cooperation agreements. *See* U.S.S.G. § 1B1.8 ("Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of *others....* ") (emphasis added), 1B1.8, Notes 5 & 6 (same); *see also* U.S.S.G. Appendix C, amend. 5 (the purpose of the amendment creating § 1B1.8 was "to facilitate cooperation agreements by ensuring that certain information revealed by a defendant, as part of an agreement to cooperate with the government by providing information concerning unlawful activities of others, will not be used to increase the guideline sentence").

For these reasons, some of the defendants argue that a downward departure based on the unavailability of § 1B1.8 protection as a matter of prosecutorial practice in this district is appropriate to replace the "lost chance" to obtain a "safety valve" reduction. The government's argument that a downward departure based on the absence of § 1B1.8 protection would circumvent the "safety valve" guideline is similar to that offered with regard to circumvention of the "substantial assistance" guideline: The government asserts that a

defendant should not obtain the equivalent of a "safety valve" reduction when the defendant has not fulfilled the debriefing requirement for a "safety valve" reduction. *See* U.S.S.G. § 5C1.2(5) (stating the debriefing requirement).

The court is not entirely persuaded by the government's argument as to circumvention of § 5C1.2. Where the defendant can show that the only impediment to a "safety valve" reduction was the absence of § 1B1.8 protection, the "safety valve" guideline is not circumvented by a downward departure that places the defendant and the government in the same position both would have enjoyed had § 1B1.8 been operative, as contemplated by the Sentencing Guidelines as a whole. However, where there is some other impediment to a "safety valve" reduction, *i.e.,* where one or more of the other requirements set forth in U.S.S.G. § 5C1.2(1) through (4) are not met, the court agrees that a downward departure based on the absence of § 1B1.8 protection, as a recompense for the "lost chance" to debrief, would be inappropriate, because it would clearly circumvent the requirements for a "safety valve" reduction. Because a "safety valve" reduction is required when the criteria for such a reduction are met, *see* U.S.S.G. § 5C1.2 ("the court *shall* impose sentence in accordance with the applicable guidelines without regard to any statutory minimum sentence" if the requirements of the guideline are met) (emphasis added), it is important that the court adhere to those criteria to the extent the government has not made the defendant's satisfaction of the criteria impossible. For the court to act otherwise could circumvent both the individual guideline and the theory and structure of the guidelines as a whole.

*iii. Conflict with the guidelines as a whole.* Turning more particularly to the conflict or harmony of a downward departure on the ground asserted here with the structure and theory of the Sentencing Guidelines taken as a whole, it is clear that the goal and design of the Sentencing

Guidelines was "to achieve uniformity in federal sentencing." *Decora,* 177 F.3d at 678; *Wong,* 127 F.3d at 728 (recognizing that "one of the congressional goals in enacting the Sentencing Guidelines was the promotion of proportional and uniform sentences"). District-to-district disparities in sentencing arising from policy choices that make the provisions of U.S.S.G. § 1B1.8 (and quite likely also "substantial assistance" under § 5K1.1 and the "safety valve" of U.S.S.G. § 5C1.2) wholly inoperative in some districts, like this one, while operative in the vast majority of districts, clearly frustrate that goal, and just as clearly take the case "outside the 'heartland'" of the Sentencing Guidelines. *Koon,* 518 U.S. at 95–96, 116 S.Ct. 2035; *Allery,* 175 F.3d at 613; *O'Kane,* 155 F.3d at 975; *Wong,* 127 F.3d at 728. Such a disparity is "unjustified," because it does not arise from the proper operation of the Sentencing Guidelines, but from practices that routinely frustrate the normal operation and goals of the Sentencing Guidelines. *Cf. Meza,* 127 F.3d 545, 549–50 (7th Cir.1996) (holding that an "unjustified disparity" can provide a basis for a departure from the guidelines, and explaining that a disparity is "unjustified" when it does not arise from the proper operation of the sentencing guidelines). A downward departure on the ground asserted here would lead to greater, not lesser, nationwide uniformity in sentencing. *Decora,* 177 F.3d at 678 (the goal of the Sentencing Guidelines is uniformity); *accord Banuelos–Rodriguez,* 173 F.3d at 746 ("Gross sentencing disparities among similar contiguous federal districts because of different plea-bargaining policies of U.S. Attorneys in § 1326 prosecutions may be a valid ground for departure," in part because such disparities detracted from the "greater uniformity," even if they served intra-district uniformity). Again, the Eighth Circuit Court of Appeals has specifically sanctioned downward departures on the basis of such a disparity resulting from the exercise of prosecutorial discretion, noting that "to the extent that the government's behavior directly results in prejudice to a defendant, which is significant enough to take the case out of the heartland of the Sentencing Guidelines, district courts have the discretion to grant an appropriate downward departure." *Jones,* 160 F.3d at 483.

### 4. Prejudice to the defendants

Finding no other impediment to its authority to grant a downward departure on the grounds asserted, the court now returns to the question of whether the circumstances required in *Jones* are present here, that is, whether the defendant has shown prejudice directly resulting from the government's behavior that is significant enough to take the case out of the heartland of the Sentencing Guidelines, which would establish the court's authority to make a downward departure, in its discretion. *Jones,* 160 F.3d at 483. Although the *Jones* decision establishes the requirement, it provides little guidance on what would constitute prejudice "which is significant enough to take the case out of the heartland of the guidelines," beyond reiterating the principle that disparities in sentences among co-conspirators do not satisfy this requirement. *Id.* at 484.

The defendants here make various arguments that they were sufficiently prejudiced by the government's conduct to take their cases out of the heartland. The arguments of defendants Johnson, Ringis, and Valdivia–Cardona are based on the conundrum these defendants faced because of the lack of use immunity within the scope of § 1B1.8 protection, and the conundrum they now face in proving actual prejudice as a result of the very denial of such protection. Defendant Buckendahl's argument is qualitatively different, because he did in fact cooperate with the government without § 1B1.8 protection, but he asserts that he was actually prejudiced by the practice in this district, because he will now incur a higher sentence in this district as a result of his unprotected disclosures than he would have received in the Southern District of Iowa, where his

disclosures would have been afforded § 1B1.8 protection.

### a. The conundrums when § 1B1.8 protection is denied

The court's discussion above, in section II.B.3.d., of the potential for conflict between the downward departure sought here and the structure and theory of the guidelines, considered individually and as a whole, provides the background for understanding the conundrums faced by defendants in this district in deciding whether or not to cooperate with the government. As the court explained, a defendant's *inability* to obtain use immunity pursuant to § 1B1.8 may well *preclude* a substantial assistance motion for that defendant pursuant to § 5K1.1, because the additional sentencing exposure to the defendant arising from non-immunized disclosures could more than offset any benefit to that defendant from a substantial assistance motion, and thus chill the defendant's willingness to cooperate with prosecutors. Similarly, it is readily apparent that denial of "use immunity" is just as likely to chill a defendant's desire or ability to debrief as required for "safety valve" relief under U.S.S.G. § 5C1.2(5) as it is to chill the defendant's ability to provide "substantial assistance" as required under § 5K1.1, because the increased sentencing exposure from unprotected disclosures may also outweigh the benefits of a "safety valve" reduction. This pre-sentencing conundrum led three of the defendants to decline to cooperate with the government, while one of the defendants, Buckendahl, skewered himself on the other horn of the dilemma, by cooperating with the government notwithstanding the lack of § 1B1.8 protection.

Just as importantly, these defendants face a similar conundrum as they attempt to satisfy the "prejudice" requirement of *Jones*. The government repeatedly asserts that these defendants have provided nothing more than speculation that they would have received lesser sentences had they been afforded § 1B1.8 protection. However, the very reason that these de-fendants cannot now establish that they were denied the benefits of a "substantial assistance," "safety valve," or "role" reduction is that they have no protection for the disclosures that are necessary to attempt to establish their qualification for such reductions.

These conundrums are what some of the defendants describe as "lost chance" prejudice: They could not cooperate, and cannot now prove they would have obtained benefits from their cooperation, in the absence of § 1B1.8 protection. These conundrums are brought into further relief as the court considers each defendant's assertion of prejudice individually.

### b. Non-cooperators

The horn of the pre-sentencing dilemma chosen by three of the defendants—Johnson, Ringis, and Valdivia–Cardona—was not to cooperate at all with the government prior to sentencing. Their sentencing conundrum concerns their inability to provide evidence that their cooperation would have provided benefits that are not so speculative as to be disregarded by the court. The court's individual examination of the defendants' prejudice will begin with these three non-cooperators.

*i. Johnson's prejudice.* Johnson argues that he was placed in a position in which cooperating with prosecutors in this district created an adverse risk at sentencing, while failure to debrief deprived him of the benefits of U.S.S.G. § 1B1.8 and other provisions of the Sentencing Guidelines, including the "substantial assistance" and "safety valve" provisions. Had he been in the Southern District of Iowa, or one of the vast majority of other federal districts providing § 1B1.8 protection, Johnson contends, he would have faced no such dilemma. At oral arguments, Johnson argued further that when the government denied him "use immunity" within the scope of § 1B1.8 protection, "the dominoes began to fall," leading to his inability to cooperate with the government, the filing of his motion to suppress evidence, and the testimony in support of his motion to

suppress that in turn led to the denial of a reduction for "acceptance of responsibility" and imposition of an increase in sentence for "obstruction of justice." The government counters that any claim that Johnson would ultimately have reduced his sentence with § 1B1.8 use immunity, or that the absence of such immunity has increased his sentence, has no factual basis in the record. The government asserts as well that nothing it has done has precluded Johnson from obtaining the benefit of the "safety valve" guideline, U.S.S.G. § 5C1.2, by debriefing concerning his own criminal activities.

The court finds, first, that no conduct of the government is responsible for the increase in Johnson's sentence for "obstruction of justice" and the consequent denial of any reduction for "acceptance of responsibility." Johnson is responsible for the untruthful testimony that caused the "obstruction of justice" increase, and controlling precedent of this circuit requires denial of "acceptance of responsibility" where the defendant is found to have obstructed justice. *See Honken*, 184 F.3d at 968–69. Although the court sympathizes with the defendant's assertion that he would not have pleaded guilty in the hope of obtaining a reduction for "acceptance of responsibility" had *Honken* been decided prior to his plea-taking hearing, the fact remains that it was the defendant's conduct that caused the increase in his sentence for "obstruction of justice" and denial of his motion for a reduction based on "acceptance of responsibility."

Furthermore, Johnson has failed to carry his burden to show that conduct of the government, in denying him a plea agreement including § 1B1.8 protection, precluded him from obtaining a "safety valve" reduction. As this court explained above, in Section II.B.3.d.ii, where the defendant can show that the only impediment to a "safety valve" reduction was the absence of § 1B1.8 protection, the "safety valve" guideline is not circumvented by a down-

ward departure that places the defendant and the government in the same position both would have enjoyed had § 1B1.8 been operative, but where there is some other impediment to a "safety valve" reduction, the court finds that a downward departure based on the absence of § 1B1.8 protection, as a recompense for the "lost chance" to debrief, would be inappropriate. The court found above, in Section I.B.2.a., that there was credible evidence of the presence of weapons in Johnson's residence during events pertinent to the charges against him and Johnson's participation in attempts to intimidate persons owing drug debts to his associate during which weapons were used or carried. Consequently, Johnson is otherwise ineligible for a "safety valve" reduction, because he does not meet the second criterion for such a reduction, that "the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense." *See* U.S.S.G. § 5C1.2(2).

Johnson's conundrum, however, is very real as to his assertion that, but for the lack of § 1B1.8 protection, he would have been entitled to a "substantial assistance" reduction. Admittedly, on the record presented here, such an assertion amounts to no more than speculation. Yet, the very reason Johnson cannot present evidence to prove his "lost chance" of a substantial assistance reduction, he contends, is the lack of § 1B1.8 protection. It seems to this court that to ignore the practical impact of the government's denial of § 1B1.8 protection on Johnson's ability to prove prejudice resulting from the lack of such protection is to ignore very real, if potentially unquantifiable, prejudice that is "significant enough to take the case out of the heartland of the guidelines." *Jones*, 160 F.3d at 483.

██ Nevertheless, this court must, *with extraordinary reluctance*,[11] conclude

---

**11.** I use the phrase "extraordinary reluctance," because I am certain that some defendants in the Northern District of Iowa receive

a harsher sentence only because they are prosecuted in a district where § 1B1.8 protec-

that it does not have the authority to depart from the Sentencing Guidelines on the basis of disparate denial among the districts of use immunity within the protection of § 1B1.8, *owing to an insufficient showing of prejudice under Jones that would take Johnson's case out of the heartland.* The court reaches this conclusion in the absence of specific guidance from the Eighth Circuit Court of Appeals recognizing such speculative evidence of "lost chance" prejudice as sufficient under *Jones;* in the absence of a circuit-created exception to *Jones* based on the conundrum presented here, in which the defendants are precluded from proving their prejudice by the very denial of § 1B1.8 protection that prejudices them; and in the absence of concrete evidence of prejudice in the form of an increased sentence resulting from the denial of § 1B1.8 protection. It is obvious that the *Jones* requirement of prejudice, as the court understands it, cannot be met by defendants such as Johnson, Ringis, and Valdivia–Cardona, who become impaled on the horns of the dilemma created by the policy or practice of the United States Attorney's Office for the Northern District of Iowa of denying § 1B1.8 protection. In the absence of clear authority from the Court of Appeals for this Circuit, it is entirely understandable that a defendant would be unwilling to take the "plunge" and debrief, testify, or put on evidence at sentencing without § 1B1.8 protection or knowledge that our Circuit would authorize a downward departure on the basis of the denial of § 1B1.8 protection. However, if armed with the knowledge that there was a reasonable possibility of a downward departure based on denial of § 1B1.8 protection, a defendant would be in a position to make

a reasoned decision whether to put on evidence meeting the *Jones* standard, such as evidence demonstrating what assistance the defendant could have provided or what role he or she actually played in the offense. At least future defendants would not be forced into the current Sisyphian dilemma of fearing that any such labors would only be for naught, or worse, would only increase their burdens.[12] The authority to make such a downward departure would bring some measure of equity to what I perceive to be unjust treatment, because once such authority is available, the conundrum is eliminated. Although what would remain would perhaps be a hard choice, it would no longer be a certainty of detriment. *Cf. United States v. Mezzanatto,* 513 U.S. 196, 209, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995) (observing that the dilemma faced by a defendant given the choice of accepting a waiver of the protection under Rule 11(e)(6) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence from use of plea statements at trial as the price of entering into plea discussions was "indistinguishable from any of a number of difficult choices that criminal defendants face every day").

Should the Eighth Circuit Court of Appeals find that a "lost chance" to prove prejudice from denial of § 1B1.8 protection resulting from the very denial of such protection is sufficient to establish "prejudice from government conduct" within the requirements for a departure established in *Jones,* or is sufficient to establish a circuit-recognized exception to *Jones,* this court would be more than happy to act upon that authority and proceed to the discretionary part of the downward depar-

tion is unavailable. This disparity is patently unfair and should be intolerable in any system of criminal justice, particularly one under the Sentencing Guidelines, which were adopted allegedly for the purpose of reducing disparities in the sentencing of similarly situated defendants nationwide.

12. In Hell, the Trojan hero Aeneas saw "Sisyphus, whose task was to roll a huge stone up

to a hill-top, but when the steep was well-high gained, the rock, repulsed by some sudden force, rushed again headlong down to the plain. Again he toiled at it, while the sweat bathed all his weary limbs, but all to no effect." BULFINCH'S MYTHOLOGY (Richard P. Martin ed., HarperCollins Publishers 1991).

ture analysis—consideration of the question of whether, in its discretion, the court should grant a downward departure in Johnson's case—and to that end would consider taking more evidence, including the very evidence Johnson is currently prevented from presenting by denial of § 1B1.8 protection. In the present circumstances, however, Johnson's motion for a downward departure must be denied on the ground that the court lacks the authority to make such a downward departure.

*ii. Ringis's prejudice.* Like Johnson, Ringis argues that denial of use immunity within the scope of § 1B1.8 protection deprived him of the opportunity to obtain any reduction for substantial assistance.[13] He seeks a reduction from the 121 to 151 month sentencing range suggested in his PSIR to the mandatory minimum of 60 months for the offenses to which he pleaded guilty. In response to the court's questions about whether it was simply too speculative to find on the record presented here that Ringis would have gotten a lesser sentence had he been given § 1B1.8 protection, Ringis's counsel invited the court to make a downward departure to "penalize" the government for withholding, as a matter of district practice, the only means by which Ringis could have reduced his sentence. Counsel cited no authority supporting the proposition that the court may make a downward departure to penalize government behavior, counsel has provided no citations to such authority since the hearing, and this court has found no such authority.

Furthermore, the court sees no necessary connection between the government conduct upon which the downward departure is premised and a reduction to the mandatory minimum sentence for Ringis's offense. Nothing about the government's challenged conduct in this case increased Ringis's offense level, which is instead based primarily on the quantity of drugs in Ringis's possession. The court indicated above, in Section II.B.3.d.i., that it considers the appropriate degree of departure for denial of § 1B1.8 protection to be a return to the sentence *ante* any disclosures, which is the position Ringis already enjoys having made no disclosures. A reduction to an offense level that bears no relationship to the offense level for the quantity of drugs found in Ringis's possession, even for a defendant who decided not to cooperate in the face of denial of § 1B1.8, would amount to a penalty against the government, for which there is no authority.

The record clearly establishes that Ringis was not given § 1B1.8 protection and that he agreed to plead guilty without such protection pursuant to a plea agreement that did not require him to cooperate. That plea agreement also specifically stated that, as a consequence of Ringis's lack of cooperation, the government would not make any motion for a reduction for "substantial assistance." What is absent from the record is any basis, other than speculation, for the assertion that Ringis's sentence would have been reduced for substantial assistance had he been given the protection of § 1B1.8. However, like Johnson, the very reason that Ringis cannot present evidence to prove his "lost chance" of a substantial assistance reduction is the lack of § 1B1.8 protection.

Although this court would be inclined to find in these circumstances that Ringis has suffered prejudice as a direct result of the government's conduct that is sufficient to take his case out of the heartland, *see Jones,* 160 F.3d at 483, it must conclude, again reluctantly, that it does not have the authority to depart from the Sentencing

---

13. Ringis does not assert that he was deprived of a "safety valve" reduction by the government's denial of § 1B1.8 protection, and indeed he could not have made such an argument successfully, in light of his plea of guilty to the offense of being a user of controlled substances in possession of firearms and ammunition. His plea of guilty to that offense establishes that the second criterion of "safety valve" guideline has not been satisfied. *See* U.S.S.G. § 5C1.2(2) (requiring that the defendant "did not . . . possess a firearm or other dangerous weapon . . . in connection with the offense").

Guidelines on the basis of disparate denial among the districts of use immunity within the protection of § 1B1.8, owing to an insufficient showing of prejudice under *Jones* that would take Ringis's case out of the heartland. Once again, the court reaches this conclusion in the absence of specific guidance from the Eighth Circuit Court of Appeals recognizing such speculative evidence of "lost chance" prejudice as sufficient under *Jones;* in the absence of a circuit-created exception to *Jones* based on the conundrum presented here, in which this defendant is precluded from proving his prejudice by the very denial of § 1B1.8 that prejudices him; and in the absence of concrete evidence of prejudice in the form of an increased sentence resulting from the denial of § 1B1.8 protection.

The court is just as willing to revisit the question in Ringis's case as in Johnson's, should the Eighth Circuit Court of Appeals find that a "lost chance" to prove prejudice from denial of § 1B1.8 protection resulting from the very denial of such protection is sufficient to establish "prejudice from government conduct" within the requirements for a departure established in *Jones,* or is sufficient to establish a circuit-recognized exception to *Jones.* If such authority were available, this court would proceed in Ringis's case to the question of whether, in its discretion, to grant a departure, and would to that end consider taking more evidence, including the very evidence Ringis is currently prevented from presenting by denial of § 1B1.8 protection. However, under present authorities, Ringis's motion for a downward departure must be denied on the ground that the court lacks the authority to make such a downward departure.

***iii. Valdivia–Cardona's prejudice.*** Valdivia–Cardona asserts that, like defendants Johnson and Ringis, he was prevented from making any disclosures, and thus obtaining a "substantial assistance" reduction, by the government's denial of § 1B1.8 protection. He also argues that he was denied the opportunity to seek a "role" reduction, because he could not disclose information demonstrating his relatively minor role in the offense of conviction. He seeks a reduction in his sentencing level from 26 to 24 (or 22), the level of his sentence in the absence of the methamphetamine he contends he did not know would be present in one of the packages of contraband he received.

First, even assuming the court found it was otherwise appropriate to depart in Valdivia–Cardona's case, the court finds no necessary connection between the denial of § 1B1.8 protection as the result of routine prosecutorial practice and the reduction Valdivia–Cardona requests. Just as nothing in the government's challenged conduct increased Ringis's sentence based on drug quantity, nothing about the denial of § 1B1.8 protection had any effect upon the inclusion of the methamphetamine in the calculation of Valdivia–Cardona's offense level. Furthermore, as the government asserts, in *United States v. Rodriguez–Ochoa,* 169 F.3d 529 (8th Cir.1999), the Eighth Circuit Court of Appeals held that a defendant's mistaken belief that a package contained one controlled substance instead of another was not a basis for a downward departure. *See Rodriguez–Ochoa,* 169 F.3d at 530.

As to Valdivia–Cardona's assertion that the lack of § 1B1.8 protection deprived him of a "role" reduction under U.S.S.G. § 3B1.2, and a "substantial assistance" reduction under U.S.S.G. § 5K1.1, the issues are more complicated. The court agrees that, in all likelihood, the absence of § 1B1.8 protection deprived Valdivia–Cardona of the opportunity to present evidence that he would be entitled to such reductions. However, as with other defendants, any conclusion that Valdivia–Cardona would in fact have obtained such reductions had he been able to present such evidence is entirely speculative. Like Johnson and Ringis, the very reason that Valdivia–Cardona cannot present evidence to prove his "lost chance" of a "substantial assistance" or "role" reduction is the lack of § 1B1.8 protection.

Although this court would be inclined to find in these circumstances that Valdivia–Cardona has suffered prejudice as a direct result of the government's conduct that is sufficient to take his case out of the heartland, *see Jones,* 160 F.3d at 483, it must conclude, again reluctantly, that it does not have the authority to depart from the Sentencing Guidelines on the basis of disparate denial among the districts of use immunity within the protection of § 1B1.8, owing to an insufficient showing of prejudice under *Jones* that would take Valdivia–Cardona's case out of the heartland. Once again, the court reaches this conclusion in the absence of specific guidance from the Eighth Circuit Court of Appeals recognizing such speculative evidence of "lost chance" prejudice as sufficient under *Jones;* in the absence of a circuit-created exception to *Jones* based on the conundrum presented here, in which this defendant is precluded from proving his prejudice by the very denial of § 1B1.8 that prejudices him; and in the absence of concrete evidence of prejudice in the form of an increased sentence resulting from the denial of § 1B1.8 protection.

The court is just as willing to revisit the question in Valdivia–Cardona's case as in Johnson's, or Ringis's, should the Eighth Circuit Court of Appeals find that a "lost chance" to prove prejudice from denial of § 1B1.8 protection resulting from the very denial of such protection is sufficient to establish "prejudice from government conduct" within the requirements for a departure established in *Jones,* or is sufficient to establish a circuit-recognized exception to *Jones.* If such authority were available, this court would proceed in Valdivia–Cardona's case to the question of whether, in its discretion, to grant a departure, and would to that end consider taking more evidence, including the very evidence Valdivia–Cardona is currently prevented from presenting by denial of § 1B1.8 protection. However, under present authorities, Valdivia–Cardona's motion for a downward departure must be denied on the ground that the court lacks the authority to make such a downward departure.

### c. The cooperating defendant

Buckendahl's case is considerably more complicated than that of the non-cooperating defendants, because Buckendahl provided disclosures despite the absence of § 1B1.8 protection. Buckendahl asserts that providing such disclosures actually increased his offense level, and hence his sentence. However, the government contends that it knew everything necessary to establish Buckendahl's present sentencing guideline level of 43, and criminal history of 1, for a guideline range of life imprisonment, before he made disclosures pursuant to the plea agreement the government reached with Buckendahl, which was dated February 5, 1999, and accepted by Buckendahl on February 10, 1999. Buckendahl counters that interviews on which the government relies were obtained after Buckendahl agreed to cooperate with task force investigators, thus attempting to invoke protection like that afforded under U.S.S.G. § 1B1.8 from the time Buckendahl signed a cooperation agreement with task force investigators on January 14, 1998.

 In its statement of the factual background to Buckendahl's case, the court specifically reserved the question of whether Buckendahl has met his burden of establishing that his sentence was increased by cooperation statements that otherwise would have received § 1B1.8 protection, thus showing the kind of prejudice this court believes is contemplated in *Jones.* In other words, the court is satisfied that it has the *authority* to depart in this case, because an actual increase in sentence as a direct result of conduct of the government is prejudice that is significant enough to take this case out of the heartland. *See Jones,* 160 F.3d at 483; *and see generally Maxwell,* 25 F.3d at 1400 ("[w]hether the circumstances upon which the district court relies to depart *is of a kind or degree* that may appropriately be relied upon to justify departure is a question of law [the appellate courts] review de novo.") (emphasis added). Howev-

er, Buckendahl may nonetheless be denied such a downward departure if he fails to prove, as a matter of fact, that he actually suffered such prejudice, or if, in the court's discretion, the court determines on the facts of the case that Buckendahl should not receive a downward departure. *See, e.g., Decora,* 177 F.3d at 677 (" 'The decision as to whether and to what extent departure is warranted rests with the sentencing court on a case-specific basis.' ") (quoting U.S.S.G. § 5K2.0).

▬▬▬ The first issue the court must settle to make the necessary determinations is, who is the "government" with whom the defendant must have a cooperation agreement in order to obtain § 1B1.8 protection? Buckendahl's January 14, 1998, Cooperation Statement, upon which Buckendahl relies as establishing the point from which his § 1B1.8 protection should have run, is an agreement with investigators of a joint local, state, and federal task force, not with federal prosecutors. In *United States v. Rutledge,* 900 F.2d 1127 (7th Cir.), *cert. denied,* 498 U.S. 875, 111 S.Ct. 203, 112 L.Ed.2d 164 (1990), the Seventh Circuit Court of Appeals observed,

> We are inclined to think, by the way, that [the reference to "the government"] in the Guidelines should be interpreted narrowly. The provision on agreements is addressed to prosecutors rather than to police, and it would wreak much havoc with prosecutorial prerogatives if casual inducements by police officers were treated as enforceable plea agreements. It is true that the provision speaks of "the government" rather than of the Department of Justice, and that it is not limited to formal plea bargaining. Yet, although [the defendant] had been indicted, the interrogation of [the defendant] followed immediately upon his arrest and before there were even the glimmerings of plea negotiations. So far as appears, no prosecutors were present, and it is certain that [the defendant] was questioned not by prosecutors but by ordinary drug enforcement agents. It is certain too that the interrogating agents were not mindful of the possible interplay between statements that they might make to him and his entitlements under the Sentencing Guidelines.

*Rutledge,* 900 F.2d at 1131–32. This court agrees that, in the context, the reference to the "government" in U.S.S.G. § 1B1.8 is to federal government prosecutors, not law enforcement officials. Because the Cooperation Statement was only an agreement with investigators, it does not come within the scope of § 1B1.8 protection, and this court need not reach the question of whether an agreement with members of a joint local, state, and federal task force necessarily is an agreement with the federal government, which would be binding in this prosecution by federal prosecutors. *See, e.g., United States v. Hall,* 984 F.2d 387, 389–90 (10th Cir.1993) (holding that a cooperation agreement with state prosecutors was not binding on the United States under the facts of the case, because it concerned only state crimes and United States representatives did not know about, or agree to be bound by, the agreement).

However, even if an agreement with investigators might otherwise come within the scope of § 1B1.8 protection, the language of the Cooperation Statement itself must be considered. *See Rutledge,* 900 F.2d at 1132 ("If all we have said thus far is wrong, there is still the language of the plea agreement to be considered."). The court finds that the Cooperation Statement is little more than a written and signed *Miranda* warning: It states that Buckendahl understands that he is under arrest; that information provided to investigators will be made available to prosecutors and courts and that "such information may be fully considered in any future judicial proceeding"; that Buckendahl understands that he has a right to speak to an attorney; that he has the right to stop cooperating at any time; and that he has no questions about these rights. Defense Exhibit 2. Perhaps still more importantly in the context of the present controversy, the Cooperation Statement states that "the investi-

gating officers who have presented me with this statement have no authority to negotiate plea agreements or other arrangements concerning possible criminal charges that I may face," and that "no promises, express or implied, have been made to me by the investigating officers concerning the impact of my cooperation on the disposition of any possible state or federal criminal charges that I may face." *Id.* Thus, the Cooperation Statement plainly does not provide "use immunity" protection within the meaning of § 1B1.8 and expressly states that the investigators have no authority to enter into any such agreement. Therefore, Buckendahl's § 1B1.8 protection, if any, cannot run from the date of the January 14, 1998, Cooperation Statement.

The court has reviewed the government's exhibits and finds that they do establish the basis for Buckendahl's present sentencing level prior to the date he entered into any cooperation agreement with the federal government that denied him "use immunity" protection. Buckendahl asserts that only his own disclosures confirmed the government's mere "suspicions" that he had a leadership role in the conspiracy with which he is charged and that any dealing of drugs occurred within a school zone. However, prior to February 10, 1999, the date of Buckendahl's plea agreement with the federal government, and even prior to October 15, 1998, the date of his informal proffer letter agreement with the government, an interview of a cooperating co-conspirator prepared August 26, 1998, establishes that drug dealing pursuant to the conspiracy with which Buckendahl was charged was taking place from a residence within one thousand feet of a school. *See* Government Exhibit 5, ¶ 3. The government's exhibits of information obtained prior to Buckendahl's potentially protected disclosures are replete with statements concerning Buckendahl's central leadership role in the conspiracy. Buckendahl's protestations that the interview statements are not credible notwithstanding, the court finds this evidence sufficiently credible to establish that the government did indeed know the scope of Buckendahl's conduct establishing his present offense level prior to the time at which any of his disclosures were made under a plea agreement lacking § 1B1.8 protection.

■ Thus, Buckendahl's situation falls precisely within the circumstances this court identified above, in Section II. B.3.d.i., in which the defendant is no worse off for making disclosures, because the government already knew everything necessary to establish the defendant's enhanced sentencing level without the defendant's disclosures. Buckendahl has lost nothing from the lack of § 1B1.8 protection, because his sentencing level was not changed by his unprotected disclosures, although he may still have something to gain from providing substantial assistance. Thus, Buckendahl has demonstrated no direct prejudice from government conduct, on the basis that his sentence was increased as a result of the denial of § 1B1.8 protection, that is sufficient to take his case out of the heartland. *See Jones,* 160 F.3d at 483.

Nor can Buckendahl assert that he should receive a downward departure based on a "lost chance" to obtain a "substantial assistance" reduction. Instead, the government represented at Buckendahl's individual sentencing hearing that, unless circumstances change before the imposition of sentence, the government does intend to make a motion for such a reduction pursuant to U.S.S.G. § 5K1.2 in Buckendahl's case.

Therefore, defendant Buckendahl's motion for a downward departure must also be denied, but this time for failure to prove that a downward departure is warranted on the facts of his case, not for lack of authority to make such a downward departure if the circumstances were as Buckendahl asserted them to be.

### III. CONCLUSION

As the Eighth Circuit Court of Appeals has suggested, "to the extent that the gov-

ernment's behavior directly results in prejudice to a defendant, which is significant enough to take the case out of the heartland of the Sentencing Guidelines, district courts have the discretion to grant an appropriate downward departure." *Jones,* 160 F.3d at 483. The court finds that there is a disparity between the routine practice of the United States Attorney's Office for the Northern District of Iowa, which is to deny cooperating defendants use immunity within the meaning of U.S.S.G. § 1B1.8 protection, and the practice in the Southern District of Iowa—and indeed, the practice in the vast majority of the federal districts in the country—which is to grant such immunity. On the basis of the analysis required under *Koon,* 518 U.S. at 95–96, 116 S.Ct. 2035, the court finds that such a disparity has the potential to take a case out of the "heartland" of the Sentencing Guidelines; the disparity is not a feature considered in the Sentencing Guidelines; and a departure on the ground asserted would not conflict either with individual guidelines or the structure and theory of the guidelines taken as a whole.

However, the applications of defendants Johnson, Ringis, and Valdivia–Cardona for such a downward departure here founder on the requirement that each show prejudice that is significant enough to take his case out of the heartland of the Sentencing Guidelines. *Jones,* 160 F.3d at 483. For the reasons articulated above, these defendants cannot demonstrate that they were subjected to a longer sentence as the result of denial of § 1B1.8 protection than they would otherwise have received, and the court, with reluctance, concludes that the "lost chance" prejudice asserted by these defendants appears to be insufficient to satisfy the "prejudice" requirements of *Jones* that would establish the court's authority to grant, in its discretion, a downward departure based on denial of § 1B1.8 protection.

Defendant Buckendahl's motion for a downward departure must also be denied, but not on the ground of lack of authority for such a downward departure. Rather, the court concludes that it would have the

authority to depart if a defendant who made disclosures in the absence of § 1B1.8 protection showed that he or she suffered an increase in his offense level, and hence his sentence, as a direct result of the government's denial of § 1B1.8 protection. Such a defendant would have shown prejudice that was significant enough to take his or her case out of the heartland. *See Jones,* 160 F.3d at 483. However, Buckendahl has failed to prove, as a matter of fact, that he actually suffered such prejudice. Thus, no downward departure is warranted on the facts of his case.

Therefore, the motions for downward departure made by each of the defendants, on the basis of a disparity between federal districts in availability of § 1B1.8 protection, are **denied**.

**IT IS SO ORDERED.**